CARL BOLANDER & SONS CO., et al., Respondents,

v.

CITY OF MINNEAPOLIS, et al., petitioners, C.S. McCrossan Construction Inc., petitioner, Appellants,

Palda & Sons, Inc., Shafer Contracting Co., Inc., Shaw–Lundquist Associates, Inc., Respondents.

No. C4–88–2383.

Supreme Court of Minnesota.

Feb. 2, 1990.

Rehearing Denied March 12, 1990.

Gerald Fitzgerald, Minneapolis City Atty., Robert L. Meller, Jr., Best & Flanagan, Minneapolis, for City of Minneapolis.

Thomas J. Rooney, Rooney & Neilson, Ltd., Arden Hills, for C.S. McCrossan Const. Co., Inc.

Patrick J. O'Connor, Jr., Hart, Bruner & O'Brien, P.A., Minneapolis, for Carl Bolander & Sons, Co., et al.

Carl A. Swenson, Doherty, Rumble & Butler, St. Paul, for Shafer Contracting Co., Inc., Palda & Sons, Inc., Shaw–Lundquist Associates, Inc.

Considered and decided by the court en banc.

KEITH, Justice.

The question in this case is whether a bid on a public construction contract, which did not include the name of a potential women-owned subcontractor for five percent of the

total value of the contract as required by the specifications, rendered the bid materially nonresponsive. The trial court found the contract, as bid, valid and enforceable. The court of appeals reversed. We affirm the court of appeals.

The material facts are not in dispute. On August 25, 1988, the City of Minneapolis through its Park & Recreation Board (Board) invited public bids for a contract for construction of improvements to the West River Parkway ("Project"). The bid documents, provided to all bidders, included a requirement that the successful bidder employ at least 10% Minority Owned Business Entities ("MBE") and 5% Women Owned Business Entities ("WBE") as subcontractors on the Project.

> The Park and Recreation Board has concluded that reasonable opportunities exist for W/MBE sub-contracting on this project, therefore, the apparent low bidder shall be required to sub-contract ten percent (10%) of his/her total bid price with minority-owned businesses and five percent (5%) of his/her total bid price with women-owned businesses on all contracts.

Notice of Call for Bids. The Call for Bids also stated that omission of required information concerning the women/minority owned business subcontracts would render a bid nonresponsive.

> All bidders submitting proposals on this project are required to comply with Section II "Local Requirements for Women and Minority Business and Equal Employment Opportunity for the City of Minneapolis" and submit this information with their bid documents by the specified bid opening time and date. *Failure to submit this information with your bid shall render a bid/bidder nonresponsive and that bid will not be considered by the City.*

(emphasis added).

Section II, "Women and Minority Business Participation Requirements and the Provision of Equal Employment Opportunities," further stated that failure to complete and submit certain information, including "Attachment C," would render the bid nonresponsive.[1] "Attachment C" of the bidding form stated the City of Minneapolis goal that the contractor would use 10% of the award for Minority Owned Business Enterprises and 5% of the award for Women Owned Business Enterprises. Attachment C also required the applicant to list in Part B those women/minority firms which it would use its best efforts to employ as subcontractors if awarded the contract. Part B stated: "Our firm will utilize and document its best efforts to enter into subcontracts with the following women/minority businesses in the event it is awarded the contract." Spaces were provided to list the firm name, address, telephone number, and dollar amount to be awarded. The Attachment had a "sworn statement" that the contractor would "adopt and pursue this *15 (15%)* PERCENT goal." (The percentages were filled in by the bidder).

The city did not require subcontracts to be negotiated or executed in advance. The apparent low bidder was required to produce executed subcontracts or letters of intent showing its compliance with Section 139.50 of the Minneapolis Civil Rights Ordinance at a pre-award conference, after opening of the bids.[2] Section II, WBE–2.03D at 00425–06.

---

**1.** "C. *Review of Requirements.* * * *
a) The information in this Section II Document (Attachments A, B, C, and D) shall be *completed and submitted* with all required bid documents on the specified bid opening date. *Failure to submit the aforementioned attachments shall render the bid/bidder non-responsive and that bid shall not be considered by the City.*
Section II, WBE–2.01C at 00425–01 (emphasis added).

**2.** At the time of the conference the apparent low bidder could meet its W/MBE subcontracting requirement by using "best efforts" to solicit and utilize W/MBEs. The low bidder could use one of four methods: joint venture arrangement with W/MBEs; negotiated subcontract; competitive bidding; or, if the bidder believed he or she would not be able to meet the goal, then the bidder had to solicit W/MBE involvement by sending certified letters to at least three W/MBEs and obtaining at least a minimum response.

On September 15, 1988, the Board opened the bids and determined that McCrossan was the low bidder. McCrossan's bid was $2,141,622.80. Bolander was the apparent second low bidder at $2,168,347.50.

On Attachment C, McCrossan listed a minority-owned firm as potential subcontractor for fifteen percent of the project cost and McCrossan's CEO signed the sworn statement. McCrossan did not list any women-owned firm. Bolander examined McCrossan's bid on September 19, 1988 and noted that the bid did not list any women-owned business. Bolander submitted a written protest to the Board, and a few days later the Board informed Bolander that the contract had been awarded to McCrossan. Bolander promptly instituted this suit for a temporary injunction and a judgment that the contract was invalid and unenforceable, and that the contract should be awarded to Bolander. After two hearings (and initially granting a temporary injunction), the trial court in an order for judgment dated October 13, 1988, denied the motion for a temporary injunction and declared the contract valid and enforceable.

The court relied in part on the testimony of Mary Nagler, the Project Manager for the W/MBE Program of Minneapolis. Nagler testified that the W/MBE figures were goals to be achieved rather than hard and fast requirements. After the bids were opened, she noted that McCrossan did not list a women-owned business. She called McCrossan and was informed that McCrossan intended to have M.B.E., Inc., its subcontractor, further subcontract 5% of its total bid to a women-owned business. McCrossan agreed that L & D Trucking, a woman-owned firm, would be used to perform the work. The trial court found that McCrossan "is now bound by its bid and its oral representation that it will require its minority business enterprise to subcontract 5% to a WBE as part of its contract with [M.B.E., Inc.]." The court held that there was no prejudice to other bidders, and that this case did not reach the level of ambiguity and unfairness required in *Gale v. City of St. Paul*, 255 Minn. 108, 114–15, 96 N.W.2d 377, 381–382 (1959).

A divided court of appeals reversed the trial court. The majority held that the bid was nonresponsive because it failed to include the name of a potential women-owned subcontractor. The majority reasoned that the nonresponsiveness was "material" because McCrossan, by failing to include the name of a women-owned firm, gained "(1) the ability to repent after discovering its bid was too low or otherwise too difficult to fulfill, and (2) the opportunity to further negotiate." *Bolander & Sons v. City of Minneapolis*, 438 N.W.2d 735, 738 (Minn. App.1989). The majority held that the Board lacked authority to find that the bid was responsive after it opened the bid. The court further held that Bolander was entitled to its costs in preparing its unsuccessful bid and its expenses, including attorney fees and remanded to the trial court for determination of the proper award.

The dissenting judge would have held the bid responsive, reasoning that signing the sworn statement bound McCrossan to use best efforts to use women and minority owned subcontractors and that "the disclosure is at best a nonbinding suggestion of prospective subcontractors." *Bolander*, 438 N.W.2d at 739 (Crippen, J. dissenting). Further, he reasoned that no bidder was prejudiced by McCrossan's bid statement. *Id.* at 740.

Under the Minnesota Uniform Municipal Contracting Law, for municipal contracts over $15,000, sealed bids must be solicited by public notice "in the manner and subject to the requirements of the law governing contracts by the particular municipality or class thereof." Minn.Stat. § 471.345, subd. 3 (1988). Further, a bid must conform substantially to the advertised plan and specifications. A public authority has a "plain duty" to reject bids which have a "substantial variance" from the plans and specifications. *Coller v. City of St. Paul*, 223 Minn. at 385, 26 N.W.2d at 840.

A public agency must determine responsiveness at the time of the opening of the bid. The public entity has no authority to make any material changes or modifications after the bid has been opened. *Col-*

ler v. City of St. Paul, 223 Minn. at 387, 26 N.W.2d at 841. This is "to deprive or limit the discretion of contract making officials in the areas which are susceptible to such abuses as fraud, favoritism, improvidence, and extravagance." *Griswold v. Ramsey County,* 242 Minn. 529, 536, 65 N.W.2d 647, 652 (1954). Thus, the trial court erred in considering Ms. Nagler's testimony concerning her telephone conversation with a McCrossan representative after the bids were opened.

█ Therefore, the issue is whether there was a variance in this case as of the date the bids were opened. It is clear that McCrossan varied from the terms of the bid when it omitted to list any women-owned firm with which it would make "best efforts" to subcontract. The Notice of Call for Bids required bidders to comply with Section II, "Local Requirements for Women and Minority Business and Equal Employment Opportunity for the City of Minneapolis" of the bid documents. Bidders were required to complete and submit "this information" with their bid documents by the specified bid opening time and date. The Call for Bids stated that "[f]ailure to submit this information with your bid shall render a bid/bidder nonresponsive and that bid will not be considered by the City." McCrossan failed to list, in Attachment C of Section II, a women-owned business with which it would use best efforts to enter into a subcontract. McCrossan listed M.B.E., Inc., a minority business enterprise, and committed itself by affidavit to spend 15% of its budget with M.B.E., Inc.[3]

The question then becomes: Was the variance substantial or material, i.e., does this variance give a bidder "a substantial advantage or benefit not enjoyed by other bidders?" *Coller v. City of St. Paul,* 223 Minn. at 385, 26 N.W.2d at 840.

Bolander argues that by failing to list a WBE with which it would use best efforts to subcontract, "McCrossan placed itself in a position where it could repent its bid if, upon bid opening, McCrossan discovered it

had bid too low in comparison to the other bidders and would lose money on the job. In other words, McCrossan's bid omission permits it to avoid the consequences of its mistakes." Brief for Appellant at 16. Further, "McCrossan's bid did not commit the contractor to employ women business enterprises on the project. By the terms of its bid, McCrossan agreed only to utilize minority business participation in direct noncompliance with the bid documents." Brief for Appellant at 18.

McCrossan argues it was bound by its CEO, Joe McCrossan's, signature to adopt and pursue the 15 percent goal. Clearly, McCrossan did not agree to be bound by a 10% minority owned business and 5% women-owned business goal, but only by an overall 15% goal. It did not agree to subcontract to a women-owned business, but only to have its subcontractor further subcontract with a WBE. Thus, McCrossan did not promise to subcontract with a WBE. This could provide an opportunity for McCrossan to repent its bid and withdraw from the contract or, at the very least, to decline to subcontract with a women owned business.

In this connection, we note the analysis of the Court of Appeals for the District of Columbia Circuit in *Northeast Constr. Co. v. Romney,* 485 F.2d 752 (D.C.Cir.1973). In *Romney,* the court upheld a contract officer's rejection of a low bid, wherein the firm had omitted required "goals for minority manpower." *Id.* at 755. The company argued that its president's signature on the document committed the firm to the stated range of minimum minority percentages. The court of appeals disagreed. The court was concerned that federal contract officers should not have to worry that, if they grant the contract to such a bidder, the bidder might then be able to renounce her bid by claiming that the omission was material, that the contract must be construed against the drafter, and that the contract as drafted "did not provide for a commitment in the absence of insertion of specific

---

**3.** McCrossan alleged, in the telephone conversation with Mary Nagler, that it intended that M.B.E. would further subcontract 5% of the

total budget to L & D Trucking, a women-owned firm. This intention does not appear on the face of the document.

goals." *Id.* at 757. The court was concerned about the contract officer being "required to buy a lawsuit." *Id.* If we do not require McCrossan, in this case, to abide strictly by the requirements of the bidding documents, we may in some future situation, in effect, require a contract officer to choose between "buying a lawsuit" or being forced by a court to award the contract to the nonresponsive low bidder. This we decline to do.

Further, failure to list a WBE gave McCrossan .a bargaining advantage with WBE subcontractors after it had submitted the low bid. Because McCrossan could wait to enter into subcontracts until after it knew the acceptable dollar figure, McCrossan had a negotiating advantage over the other bidders, who relied upon estimates to complete their bid proposals prior to the bid opening.[4]

The court of appeals correctly noted that the failure to list a women-owned firm was "taken out of the minor defect category by the plans and specifications which deem the failure to comply with the W/MBE participation requirements as grounds for nonresponsiveness." *Bolander,* 438 N.W.2d at 738 (citing *Rossetti Contracting Co. v. Brennan,* 508 F.2d 1039, 1044 (7th Cir. 1975)). *See also F–M Asphalt v. North Dakota State Highway Dept.,* 430 N.W.2d 344, 345–46 (N.D.1988).

In *Rossetti,* the contract was subject to minority requirements set by the Secretary of Labor. The bid documents indicated in an appendix the range of percentage goals for minority manpower utilization in designated trades. The bidder placed brackets around all of the trades designated on "Appendix A," and thus failed to indicate which specific trades it intended to use on the project. The bidder also placed the figure 10% opposite the bracketed trades. The 10% figure was inadequate for several trades. *Rossetti,* 508 F.2d at 1041 n. 4. The bidder offered an amended Appendix A, and a written statement showing past minority employment practices. The Department of Labor, which had primary responsibility for the minority system, notified the bidder that it lacked authority to consider post-bid-opening amendments. The Seventh Circuit Court of Appeals held that because the bidding documents provided that failure to complete or submit minority manpower utilization goals would render the bid nonresponsive, the defect in the bidder's Appendix A constituted a "material" variance. *Id.* at 1044.

Finally, we note the importance of the City of Minneapolis' goal of the women- and minority-owned subcontracting requirements. The purpose of these requirements was "to assure that businesses owned and controlled by women or minorities receive maximum feasible opportunity to be included in City procurements and capital activities." Section II, WBE–2.02B at 00425–02. Failure to require strict responsiveness, according to bid documents, would impair the competitive bidding process. For these reasons, we believe McCrossan's failure to list an appropriate women-owned business constitutes a material variation which rendered its bid nonresponsive.

■ Bolander requests costs and attorney fees since performance on this contract, we assume, has already been completed by McCrossan. Normally, an unsuccessful bidder is not entitled to damages. *Telephone Associates v. St. Louis County Board,* 364 N.W.2d 378, 382 (Minn.1985). Since McCrossan's bid was materially nonresponsive, Bolander is entitled to recover its costs incurred in preparing the unsuccessful bid for the contract and its expenses, including reasonable attorneys fees, from the time it first intervened to

---

**4.** Similarly, *Leo Michuda & Son v. Metropolitan Sanitary District,* 97 Ill.App.3d 340, 52 Ill.Dec. 869, 874, 422 N.E.2d 1078, 1083 (1981) held that a low bidder was unresponsive for failing to list minority subcontractors intended for award. Unlike the instant case, letters of intent were required. In *Michuda,* as in this case, the low bidder arguably agreed to be bound by the MBE goals on the project. The low bidder stated in its goal disclosure form that it would "use every available means to obtain the services of Minority Business Enterprises in performing this work." *Id.* 52 Ill.Dec. at 871, 422 N.E.2d at 1080. Nevertheless, the Illinois Court of Appeals held that the negotiating advantages it would enjoy rendered its bid materially nonresponsive. *Id.* 52 Ill.Dec. at 874, 422 N.E.2d at 1083.

prevent the award of the contract. *Id.* at 383. We affirm the appellate court and remand to the trial court for the determination of these costs and attorney fees.