### MINNESOTA CENTER FOR ENVIRONMENTAL ADVOCACY, Relator,

v.

### COMMISSIONER OF MINNESOTA POLLUTION CONTROL AGENCY, Respondent, City of Princeton, Respondent.

No. A04–1324.

Court of Appeals of Minnesota.

May 17, 2005.

Janette K. Brimmer, Minnesota Center for Environmental Advocacy, St. Paul, MN, for relator.

Mike Hatch, Attorney General, Paul Merwin, Stephanie Morgan, Assistant Attorneys General, St. Paul, MN, for respondent MPCA.

The City of Princeton, Princeton, MN, respondent.

Considered and decided by WILLIS, Presiding Judge; STONEBURNER, Judge; and CRIPPEN, Judge.*

## OPINION

STONEBURNER, Judge.

Relator Minnesota Center for Environmental Advocacy (MCEA) challenges respondent Minnesota Pollution Control Agency's (MPCA) grant of a permit to the City of Princeton allowing the city to triple the capacity of its current wastewater treatment facility by constructing a wastewater treatment plant (WWTP) that will discharge 1,905,000 gallons of waste per day into an outstanding resource value water, the Rum River. MCEA argues that (1) the finding that there are no prudent and feasible alternatives to the proposed discharge is not supported by substantial evidence in the record because Princeton failed to analyze the alternative of downsizing plus decentralized treatment to reduce the amount of discharge into the Rum River and (2) MPCA's failure to require available, affordable technology to reduce pollutants in the discharge permitted is contrary to the law requiring protection of the existing high quality of the water in the Rum River, not supported by substantial evidence in the record, and arbitrary and capricious. MCEA argues in the alternative that it raised factual disputes on these issues requiring a contested-case hearing.

_____
* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

## FACTS

Princeton, whose existing wastewater treatment facility is close to capacity and near the end of its useful life span, applied to MPCA for a National Pollutant Discharge Elimination System/State Disposal System permit (NPDES/SDS permit) allowing it to construct a new wastewater treatment plant (WWTP) that will triple the capacity of the current wastewater treatment method and discharge 1,905,000 gallons of wastewater per day directly into the Rum River.[1]

The affected portion of the Rum River has been classified as Outstanding Resource Value Water–Restricted (ORVW–R) since 1984. Minn. R. 7050.0180, subps. 6(D), 6a (G) (2003). An ORVW is a body of water that has "high water quality, wilderness characteristics, unique scientific or ecological significance, exceptional recreational value, or other special qualities which warrant stringent protection from pollution." Minn. R. 7050.0180, subp. 2(A). It is undisputed that the Rum River's classification is due to its scenic characteristics, recreational value, and high water quality. MPCA's nondegradation-of-ORVW policy explains that high water quality and recreational value go hand-in-hand: "the maintenance of existing high quality in some waters of outstanding resource value to the state is essential to their function as exceptional recreational, cultural, aesthetic, or scientific resources." Minn. R. 7050.0180, subp. 1. The applicable restriction on discharges to ORVWs provides in relevant part that "[n]o person may cause or allow a new or expanded discharge of any sewage ... [into an ORVW] unless there is not a prudent and feasible alternative to the discharge," and

_____
1. Princeton's current wastewater method does not discharge to any surface waters.

if a new discharge is permitted, the MPCA "shall restrict the discharge to the extent necessary to preserve the existing high quality, or to preserve the wilderness, scientific, recreational, or other special characteristics that make the water an [ORVW]." Minn. R. 7050.0180, subp. 6.

As part of the permit application, the city was required to perform a nondegradation study that included an analysis of various alternatives to determine whether any of the alternatives provided a prudent and feasible alternative to the city's proposal. One of the alternatives that the city was required to study was "[d]ownsizing the project and/or implementing water conservation practices so that a land disposal method might be used." The city rejected all of the alternatives it was required to analyze as not prudent or feasible. Downsizing was rejected as inconsistent with Princeton's planned growth over the next twenty years. Evidence in the record indicates that Princeton's population could possibly expand from its current 4,200 to 12,500 by 2024.

After reviewing Princeton's application, including its study of alternatives, plus some additional information requested by MPCA, MPCA staff recommended approval of a permit for Princeton's proposed WWTP. MPCA staff drafted and circulated for public comment an Environmental Assessment Worksheet (EAW). MCEA voiced concerns about the proposal, asserting that the alternative of downsizing had not been sufficiently analyzed as a feasible and prudent alternative, MPCA's recommended restrictions on the proposed discharge were only designed to preserve minimal water quality standards, and MPCA failed to require available, affordable technology necessary to protect the higher quality of this river. The Department of Natural Resources also requested that MPCA consider requiring additional, technological upgrades, such as sand filters, to control mercury and CBOD.[2] Neither MCEA nor the DNR requested an Environmental Impact Statement (EIS).

MPCA does not dispute that the use of treatment upgrades such as sand filters and the addition of alum would reduce phosphorus, CBOD, and total suspended solids (TSS) in the discharge, but rejected these upgrades based on its determination that the benefit would be so minimal in comparison to the cost that this alternative is not necessary to protect the quality of the water. MPCA and the city, without considering downsizing in conjunction with decentralized treatment to meet some of Princeton's projected growth, rejected downsizing on the basis that it would not allow the city to grow at the rate it anticipated.

Concluding that an EIS was not required, MPCA drafted a NPDES/SDS permit for the project that includes a limit on the discharge of phosphorus and a more-stringent-than-minimal limit on TSS, but does not require use of sand filters or alum as proposed by MCEA to further reduce these pollutants as well as CBOD. MPCA circulated the proposed permit for public comment. MCEA requested a contested-case hearing, reiterating its concerns that (1) Princeton failed to adequately consider downsizing in conjunction with decentralized treatment as a feasible and prudent alternative and (2) MPCA failed to require the effluent restrictions necessary to protect existing high water quality.

---

**2.** CBOD refers to the oxygen demand made by certain pollutants in the water body over a five-day period. If the oxygen demand is too high, dissolved oxygen (DO) in the water may become too low to support certain aquatic life. CBOD is regulated as a pollutant under portions of Minnesota Rule 7050.

In a hearing before the MPCA Citizen's Board, MPCA staff and MCEA representatives presented the proposed permit and MCEA raised its objections to the permit and requested a contested-case hearing. The board denied MCEA's request for a contested-case hearing and granted the NPDES/SDS permit with the restrictions proposed by MPCA staff. MCEA appeals the grant of the permit by writ of certiorari, arguing that MPCA's decision to reject downsizing as a feasible and prudent alternative is arbitrary, capricious, and unsupported by substantial evidence, and MPCA's failure to require the use of sand filters and alum is contrary to law, unsupported by substantial evidence, and arbitrary and capricious. In the alternative, MCEA argues that MPCA erred by denying a contested-case hearing.

## ISSUES

1. Should the city have been required to analyze whether the alternative of downsizing its proposed WWTP and using decentralized treatment methods to accommodate additional anticipated population growth is a prudent and feasible alternative to its proposed discharge of 1,905,000 gallons of wastewater per day into a river classified as ORVW–R?

2. Did MPCA misapply the law when it focused on preservation of the scenic and recreational value of the river rather than on the high water quality of the river to determine necessary restrictions on a permitted discharge?

3. Given MPCA's mandate to restrict any permitted discharge into an ORVW "to the extent necessary to preserve the existing high quality" of the water, were MPCA's restrictions in Princeton's permit arbitrary and capricious and unsupported by substantial evidence in the record because MPCA did not identify or define the existing quality of the water prior to setting the restrictions?

## ANALYSIS

### I. Standard of review

Our review of MPCA's decision to grant a permit for Princeton's proposed WWTP is governed by the Administrative Procedure Act, Minn.Stat. §§ 14.63–.69 (2004); *In re Univ. of Minn.*, 566 N.W.2d 98, 103 (Minn.App.1997). The statute provides in relevant part that this court can affirm, or remand for further proceedings, or reverse, or modify any of the agency's findings, inferences, conclusions, or decisions if they are affected by error of law, unsupported by substantial evidence in view of the entire record as submitted, or are arbitrary and capricious. Minn.Stat. § 14.69(d)-(f). The party challenging the decision of the agency has the burden of proof on appeal. *Minn. Ctr. For Envtl. Advocacy v. Minn. Pollution Control Agency*, 660 N.W.2d 427, 433 (Minn.App. 2003). The agency enjoys a presumption of correctness, and "deference should be shown by courts to the agencies' expertise and their special knowledge in the field of their technical training, education and experience." *Id.* (quoting *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 824 (Minn. 1977)).

Deference is also given to the agency's interpretation of its own rules when the language subject to construction is so technical in nature that only a specialized agency has the experience and expertise needed to understand it, when the language is ambiguous or when the agency interpretation is one of long standing.

*Id.* (quoting *Resident v. Noot*, 305 N.W.2d 311, 312 (Minn.1981)). However, this court will not defer to the agency interpretation "if the language of the regulation is

clear and capable of understanding." *Id.* (quoting *In re St. Otto's Home v. Minn. Dep't of Human Servs.*, 437 N.W.2d 35, 40 (Minn.1989)).

The parties disagree as to the level of deference to be afforded to the agency in this case. MPCA argues that this is a highly technical matter, with "onerous issues," resulting in great deference given to the agency. *See e.g., Resident*, 305 N.W.2d at 312 (explaining the general rule that this court should defer to an agency for interpretation of its rules on matters so technical that only the agency has the experience and expertise to understand it). MCEA argues that deference is unnecessary if the agency's decision is arbitrary, inconsistent, or unreasonable. *See generally St. Otto's Home*, 437 N.W.2d at 40–41 (finding agency's decision unreasonable); *In re City of Owatonna's NPDES/SDS Proposed Permit Reissuance for the Discharge of Treated Water*, 672 N.W.2d 921, 926 (Minn.App.2004) (noting that "where there is a combination of danger signals which suggest the agency has not taken a hard look at the salient problems and has not genuinely engaged in reasoned decision making," this court will intervene).

## II. Nondegradation law

The federal Environmental Protection Agency, under authority of the Clean Water Act, 33 U.S.C. §§ 1251–1387, requires each state to develop a nondegradation policy that meets minimum standards. 40 C.F.R. § 131.12(a). At a minimum, the state policy must protect the level of water quality necessary to protect existing water uses, and,

[w]here the quality of the waters exceed levels necessary to support propagation of fish, shellfish, and wildlife and recreation in and on the water, that quality shall be maintained and protected unless the State finds ... that allowing lower water quality is necessary to accommodate important economic or social development in the area in which the waters are located. In allowing such degradation ... the State shall assure water quality adequate to protect existing uses fully. Further the State shall assure that there shall be achieved the highest statutory and regulatory requirements for all new and existing point sources....

*Id.* at (a)(2). Minnesota's nondegradation policy applicable in this case is codified in Minn. R. 7050.0180. The rule sets out the policy of MPCA to prohibit or stringently control new or expanded discharges from either point or nonpoint sources to ORVWs.[3] *Id.* at subp. 1. Under the rule, "[n]o person may cause or allow a new or expended discharge of any sewage ... [into and ORVW] unless there is not a prudent and feasible alternative to the discharge." *Id.* at subp. 6. And when a discharge is permitted, "the agency shall restrict the discharge to the extent necessary to preserve the existing high quality ... that make[s] the water an [ORVW]." *Id.*

Minnesota Rules 7001.1000 to 7001.1100 (2003) govern the procedures and conditions for receiving a NPDES/SDS permit, that is required to discharge pollutants from a point source into any water in the

---

**3.** A "point source" is "any discernible, confined and discrete conveyance, including, but not limited to, any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."

Minn.Stat. § 115.01, subd. 11 (2004). A "nonpoint source" is "a land management or land use activity that contributes or may contribute to ground and surface water pollution as a result of runoff, seepage, or percolation and that is not defined as a point source." Minn. R. 7050.0130(C) (2003).

state of Minnesota. Minimal standards for municipality point sources are provided in Rule 7050.0211 (2003). Phosphorus effluent discharge is limited to 1 mg/L under this rule when the effluent is discharged to or directly affects a lake or reservoir, but there are no stated phosphorus-effluent limits for rivers and streams.[4] Minn. R. 7050.0211, subp. 1a. The rule provides, however, that removal of nutrients, such as phosphorus from wastes "shall be provided to the fullest practicable extent wherever sources of nutrients are considered to be actually or potentially detrimental to preservation or enhancement of the designated water uses." *Id.* at subp. 1a(B).

Plans for a WWTP are governed by Minnesota Rules 7077.0272 and 7077.0274 (2003). Rule 7077.0272, subp. 1, requires that plans for a wastewater treatment system must be prepared and signed by a registered engineer, and subp. 2 requires the plans to include a description of the current WWTP and its problems, a discussion of all treatment alternatives that were considered during the facility selection process, a cost-effective comparison of the alternatives, a comparison of the potential environmental impact of the alternatives, and a description of the selected treatment alternative.

MPCA's *Guidance Manual for Applying Nondegradation Requirements on Outstanding Resource Value Waters in Minnesota* (hereinafter *Guidance Manual*) describes the procedures, criteria, and time frames associated with meeting the prudent-and-feasible standard. The *Guidance Manual* notes that although the phrase "prudent and feasible" is "not familiar or highly descriptive to laypersons, it is a well-known and reasonably well-

defined term of art in environmental statutes and case law" as requiring an "examination of whether there are unusual or extraordinary reasons why an alternative to a proposed discharge should not be required." Minn. Pollution Control Agency, *Guidance Manual for Applying Nondegradation Requirements on Outstanding Resource Value Waters in Minnesota,* (1988), at 4 (citations omitted). By statute, "[e]conomic considerations alone shall not justify pollution, impairment or destruction of the [s]tate's natural resources." *Id.* (citing Minn.Stat. §§ 116D.04, subd. 6 and 116B.09, subd. 2 (2004)). The permit applicant must analyze the cost and environmental considerations associated with each alternative. *Id.* at 6. The burden of demonstrating that there is no prudent and feasible alternative is on the permit applicant. *Id.* at 5. In this case, MCEA challenges only two of the several alternatives considered and rejected as not feasible and prudent.

### III. Downsizing alternative

■ MCEA concedes that, given Princeton's anticipated growth and the inadequacy of its current wastewater treatment process, development of a WWTP that discharges into the Rum River is somewhat inevitable, but contends that Princeton should have been required to analyze the prudence and feasibility of downsizing the proposed WWTP to double the current treatment capacity and handling the treatment needs of additional growth though decentralized treatment processes. MCEA asserts that the city did not really analyze this downsizing alternative. MPCA does not argue that because some discharge may be permitted the city is not

---

4. MPCA set the phosphorus limit in this case at 1 mg/L, and the internal MPCA office memorandum regarding Princeton's WWTP, and comments by MPCA staff at the Citizen's

Board meeting, indicate that suggested phosphorus effluent limits for an ORVW, according to the MPCA Phosphorus Strategy, require a phosphorus limit of 1 mg/L or less.

required to look for prudent and feasible alternatives that would minimize the amount of the discharge.[5]

MCEA asserted that a WWTP with double the city's current capacity to treat wastewater, in conjunction with decentralized treatment of wastewater to accommodate additional growth, would significantly reduce discharge to the Rum River without limiting the city's growth and supported this assertion with the affidavit of its expert, Curtis Sparks, P.E., former MPCA consultant and program manager of the permit program (responsible for all NPDES/SDS permits in Minnesota). Sparks opined that downsizing of the WWTP could occur through the use of decentralized wastewater options that would reduce the new discharge to the Rum River and manage the wastewater from new growth areas without limiting growth. Sparks's affidavit does not specify the degree of downsizing that would accomplish this result, but the talks between MCEA and MPCA centered on downsizing to double the current capacity, and Sparks's affidavit was produced to support this proposal.

In its nondegradation analysis, Princeton stated that it is on the "Growing Edge" of the Twin Cities metro area and that failing to build a WWTP with triple the current capacity to treat wastewater would limit the city's growth potential. The city concluded that it is not prudent and feasible to downsize the project "so that a land disposal method might be used" because the project was designed to handle anticipated future growth and because the city's per capita wastewater production is already below average. MPCA accepted the city's conclusion and did not require the city to examine whether any areas of its anticipated growth are suitable for decentralized wastewater treatment or make a cost-effective comparison of this alternative as required by the Guidance Manual.

MPCA argues that MCEA has not shown how much treatment decentralized systems would provide and has not explained how it determined that decentralizing some treatment would only require doubling—rather than tripling—current treatment capacity. MPCA asserts that nonetheless it "examined" the downsizing alternative to determine if it was prudent and feasible. But the purported examination consisted of asserting narrative reasons why the alternative need not be analyzed. There was no attempt at a cost/benefit analysis or specific information about the environmental impacts of decentralized treatment coupled with a reduced discharge as compared to the proposed discharge. MPCA continues to argue that it has no control over the size of the city's WWTP[6] and asserts that centralized treatment is favored over other treatment systems under the Clean Water Act, citing Columbus & Franklin County Metro. Park. Dist. v. Shank, 65 Ohio St.3d 86, 600 N.E.2d 1042, 1058 (1992). The Shank court noted that "centralized treatment has many economic, environmental and public policy attributes ... [and][t]he poli-

5. The parties agree that downsizing to reduce the amount of a proposed discharge could be analyzed under the part of the rule that requires restrictions on a proposed discharge necessary to preserve water quality rather than under the prudent and feasible alternatives requirement of the rule, but that the prudence and feasibility of this alternative would have to be considered in either analysis.

6. MPCA acknowledged at oral argument that it has authority in other areas to make decisions that will impact community growth but asserts without explanation that control of community growth cannot be achieved through the NDPES permitting process.

cy favoring centralization pervades the Clean Water Act." 600 N.E.2d at 1058. But *Shank* does not provide the most recent commentary on decentralized systems. In September of 2000, MPCA stated in a report to the legislature, titled *Wastewater Treatment and Collection Systems* (Report), that "[t]he lack of centralized wastewater facilities is not necessarily a problem in itself. Under the right conditions, [individual sewage treatment systems] or small community systems (e.g., cluster systems) can provide excellent, cost-effective wastewater treatment." [7] Furthermore, MPCA noted a 1997 EPA report [8] to Congress concerning decentralized wastewater systems:

EPA concluded in its report, "adequately managed decentralized wastewater systems are a cost effective and long-term option for meeting public health and water quality goals." Reasons cited for installing decentralized systems included:

· Properly managed decentralized systems can provide the treatment necessary to protect public health and the environment. They can be sited, sized, designed, installed and operated to meet all federal, state, and local water-quality requirements.

· Are appropriate for low-density communities.

· Decentralized systems are usually the most appropriate technology and most cost-effective options for rural areas and many urban outskirts.

· Are appropriate for varying site conditions.

Decentralized systems can be designed for a variety of site and soil conditions including shallow water tables, bedrock and small lot sizes.

Report at 13. The MPCA Report concludes that: "[c]ommunities upgrading failing systems should consider both centralized and decentralized systems." *Id.* at 20. MPCA argues in this case that a decentralized treatment option is too speculative because it would "require a review of decentralized treatment options for each development before authorization to connect to the system ..." and because it is unknown if the land would be appropriate for such systems. We find this argument has no merit.

In this case, the mayor of Princeton told the board that the city council has already platted all of the land for the current WWTP and there are many requests for more developments. The city administrator explained that the public utilities commission has been adding and extending water lines to certain areas. As a consequence, there is a finite amount of land to be considered in an analysis of the feasibil-

7. *See* 1999 Minn. Laws ch. 231, § 198. Also *available at:* http://www.pca.state.mn.us/hot/legislature/reports/2001/wwtreatment.pdf (last visited May 11, 2005).

8. On January, 12, 2005, the EPA published a press release, regarding its continued vision for decentralized wastewater treatment systems. *See* Environmental Protection Agency, *Decentralized Wastewater Treatment Systems: A Program Strategy,* (Jan. 12, 2005) *available at* http://www.epa.gov/owm/septic/pubs/septic_program_strategy.pdf (Last visited May 11, 2005). The EPA notes that decentralized systems are a "key component" of the nation's water treatment infrastructure, and citing the 1997 report, it showed concern for areas that still needed improvement for these systems to be better recognized as the "key component" of the system. *See id.* at 1, 4. *See also,* Environmental Protection Agency, *Response to Congress on Use of Decentralized Wastewater Treatment Systems,* (1997), *mircoformed on* EPA/832/R–97/001B (U.S. Dep't of Commerce, Nat. Technical Info. Serv.), *available at* http://cfpub.epa.gov/owm/septic/publications.cfm?sort=date_ published & view=all (Last visited May 11, 2005).

ity of decentralized wastewater treatment for a finite number of people (approximately 4,000 people who would not be serviced by a double-capacity plant). And the interest in particular areas by particular developers provides a logical starting point for an investigation by the city into this alternative. There is no evidence that the city seriously considered whether downsizing coupled with decentralized treatment systems could adequately address its anticipated wastewater treatment needs. And no authority has been cited to this court that would excuse the city from examining the feasibility of this alternative to limit the proposed new discharge into an ORVW–R.

Princeton's city administrator simply dismissed the idea of decentralized systems, stating: "[o]ur experience is that onsite systems, as good as they are, are only as good as the people who maintain them," therefore if "expansion of a [WWTP] is curtailed, I believe that the impact on the Princeton area is going to be negative." But MCEA responded that "decentralized" does not necessarily mean individual mound septic systems, noting that cluster treatment facilities are permitted by MPCA and are highly regulated.

The MPCA Issue Statement submitted to the board most directly responds to the decentralized alternative by explaining that the city developed a plan to meet its population requirements, and that MCEA did not lay out specific enough treatment amounts for the decentralized alternative. But the burden of showing that downsizing was not feasible and prudent is on the city, not MCEA. MCEA has raised the issue that the alternative was never actually analyzed and it cited the Elk River community as an example where decentralized treatment for some development has allowed the city to limit the size of its WWTP. MPCA staff rejected Elk River's experience as not applicable because the

manner in which Elk River arrived at this solution differs from Princeton's approach to future wastewater treatment. But the method by which Elk River arrived at its system does not prevent the use of decentralized treatment from being an alternative subject to consideration as prudent and feasible for Princeton. Princeton has the burden to demonstrate that there are no feasible and prudent alternatives to its proposed discharge of 1,905,000 gallons of wastewater per day into an ORVW–R before MPCA can permit such discharge.

 This court can reverse or remand an agency's decision if it is unsupported by substantial evidence in the record. Minn. Stat. § 14.69. "Substantial evidence" means:

1. Such relevant evidence as a reasonable mind might accept as adequate to support a conclusion;
2. More than a scintilla of evidence;
3. More than some evidence;
4. More than any evidence; and
5. Evidence considered in its entirety.

*White v. Minn. Dept. of Natural Res.*, 567 N.W.2d 724, 730 (Minn.App.1997), *review denied* (Minn. Oct. 31, 1997). And "[t]he court will intervene ... where there is a combination of danger signals which suggest the agency has not taken a 'hard look' at the salient problems' and the decision lacks 'articulated standards and reflective findings.'" *Id.* (quoting *Cable Communications Bd. v. Nor–West Cable Communications P'ship*, 356 N.W.2d 658, 668–69 (Minn.1984) and *Herbst*, 256 N.W.2d at 825 (Minn.1977)).

In this case, we conclude that there is not substantial evidence in the record to support rejection of the alternative of downsizing the WWTP and using decentralized treatment as not feasible or prudent, and we remand this issue to the MPCA with instructions to require the city to actually analyze the prudence and feasibility of this alternative.

## IV. Restrictions on discharge

### a. MPCA's restrictions were not imposed to preserve existing water quality as required by law

■ Minnesota's nondegradation policy requires MPCA to restrict any permitted discharge to an ORVW "to the extent necessary to preserve the existing high quality, or to preserve the wilderness, scientific, recreational, or other special characteristics that make the water an [ORVW]." Minn. R. 7050.0180, subp. 6. On appeal, MPCA does not dispute that the Rum River's designation as an ORVW–R is due in part to the high quality of the water. But when MPCA staff presented the proposed permit for Princeton's WWTP to the board, Deborah Schumann, a staff permit writer in MPCA's water quality program, told the board that MPCA staff imposed restrictions "to the extent necessary to preserve the Rum River's scenic and recreational characteristics."

> Schumann erroneously asserted that this reach of the Rum River was not designated an outstanding resource value water because of high water quality, but rather its designation by the DNR is a state scenic and recreational river. So those are the characteristics that we have to protect, that's what we have the authority to do. To set stringent standards to protect the receiving stream's scenic and recreational value.[9]

Schumann also told the board that MPCA's authority to impose restrictions on wastewater discharges into the ORVW–R river is limited, stating: "[T]he extent of what [MPCA] can do" with regard to restrictions is impose the technology-based controls already established by the CWA for publicly owned treatment works.

Schumann told the board that the only reason MPCA was able to include some restrictions that exceed established standards was by negotiation with the city. Despite the comments of MCEA's representative that MPCA's responsibility is to restrict the discharge to the extent necessary to preserve the existing high water quality of the Rum River, and at least one board member's comment indicating that understanding, the board voted five to two to deny a contested hearing and to approve the permit as drafted by MPCA staff.

MPCA's findings of fact include the following:

> The MPCA finds that the effluent limits in the proposed permit *meet the minimum secondary treatment standards*, will ensure protection of the receiving water for its designated uses, *will not cause or contribute to an exceedance of water quality standards*, and will not impair those special characteristics that make the Rum River an [ORVW].

> The proposed limits reflect more stringent effluent limitations for TSS, DO, and P in order *to protect the high recreational and fishery value of the Rum River*.

(Emphasis added.) MPCA's conclusions of law include:

> The proposed *permit contains effluent limitations and special conditions which are the most stringent allowed by current rule and policy. These limits and conditions will meet or exceed the minimum secondary treatment standards*, will ensure protection of the receiving water for its designated uses, *will not cause or contribute to an exceedance of water quality standards, and will not decrease the river's existing special scenic or recreational value.*

9. An assistant attorney general who was present during the staff's presentation to the board stated that he thought Schumann meant to say that water quality standards also mattered.

(Emphasis added.) The record, findings, and conclusions demonstrate that, despite sporadic references to water quality, MPCA's focus in granting the permit was on the scenic and recreational qualities of the Rum River and that the restrictions on the discharge were set only to prevent degradation below ordinary water quality standards rather than to protect the existing high quality of the water. MPCA ignored the clear mandate of the CWA and nondegradation rules to restrict any discharge into an ORVW "to the extent necessary to preserve the existing high quality." MPCA's authority clearly extends to protect the existing high quality of the ORVW, and their own policies require an exercise of that authority to maintain the high water quality of a valuable water resource. Failure to impose restrictions designed to maintain the Rum River's high water quality constitutes an error of law. We reverse the order granting the permit and remand for reconsideration of restrictions necessary to protect the existing high quality of the water in the Rum River.

**b. MPCA's failure to define the existing high quality of the water in the Rum River makes the rejection of affordable, available technology as unnecessary to preserve that quality arbitrary and capricious.**

■ MCEA argues that MPCA's restrictions on pollutants in the permitted discharge do not satisfy MPCA's obligation under EPA rules to "assure that there shall be achieved the highest statutory and regulatory requirements for all new and existing point sources...." 40 C.F.R. § 131.12. MCEA asserts that MPCA rejected requiring effective, available, affordable technology such as sand filters and the use of alum based only on cost and an erroneous application of only minimal water quality standards plus "negotiated" higher limits for some pollutants.

Rule 7050.0211 sets out the "minimum secondary treatment for municipal point source and other point source dischargers of sewage." Minnesota Rule 7050.0220 (2003) lists "specific standards of quality and purity by associated use classes." But MCEA argues that these minimums are not sufficient to maintain the existing high quality of the water in this case as is required under the Minnesota rules and the CWA for discharge to an ORVW–R. The pertinent limits set forth in rule 7050.0211, as compared to MPCA's proposed limits for Princeton's WWTP are as follows:

| Effluent | Rule | Princeton WWTP |
| --- | --- | --- |
| $CBOD_5$ | 25 mg/L (Minn. R. 7050.0211, subp.1) | 15 mg/L |
| Fecal Coliform Organisms | 200 organisms per 100 milliliters (Minn. R. 7050.0211, subp.1) | 200 organisms per 100 milliliters |
| Total Suspended Solids | 30 mg/L (Minn. R. 7050.0211, subp.1) | 20 mg/L |
| Phosphorus | No requirement for rivers; 1.0 mg/L for lake or reservoir (Minn. R. 7050.0211, subp.1), suggested limit in Phosphorus Strategy | 1.0 mg/L |
| Mercury | 6.9 ng/L (R. 7050.0220, subp.3a, B(16)-numeric quality standard) | 17 ng/L (daily maximum) 10 ng/L (monthly average) |
| Dissolved Oxygen (non-pollutant) | 5.0 mg/L (minimum) (Minn. R. 7050.0222, subp.4) | 6.0 mg/L (minimum) |

MPCA argues that it correctly evaluated the costs and benefits of requiring sand filters and alum and concluded that the de minimus reduction in pollution that would result from their use made them unnecessary to preserve existing high water quality. But there is no evidence in the record defining or describing the quality of the water that is to be protected. Without defining what the existing quality of the water is, it is not possible to evaluate whether Princeton's proposed discharge has been restricted to the extent necessary to preserve that quality, making any cost/benefit analysis meaningless. The city clearly values the high quality of the Rum River. Princeton's city administrator told the board that if the proposed additional technology were necessary to preserve the high quality of the water: "I don't think you'd get any argument from the city of Princeton about [adding the technology]."

■ MPCA argues that the term "existing high water quality," which is not defined or quantified in statute or rule, is ambiguous, requiring MPCA to "apply its expertise in determining exactly what is meant by 'existing high water quality'" and that the court must defer to this exercise of expertise. Nowhere in the record, however, does MPCA define the existing high quality of the Rum River, so there is nothing to defer to in this case. And we do not find merit in MPCA's argument that the term "existing high quality" is so technical in nature that only a specialized agency has the experience and expertise needed to understand it. To the contrary, the phrase is clear and capable of being understood. No deference is given to an agency's interpretation of its own regulation if the language of the regulation is clear and capable of understanding, and the court may substitute its own judgment. *In re St. Otto's Home,* 437 N.W.2d at 40.

■ This is the first application for a permit to discharge pollutants into the Rum River. We hold that the "existing high quality" of water in a river into which no discharge has been previously permitted is the quality of the water prior to the issuance of any permit to discharge. Given that definition we defer to MPCA's expertise to determine and define, in terms existing pollutants in the river or other standard methods for defining water quality, the baseline quality of the water in the Rum River as it exists prior to permitting any discharge. Once that is accomplished, permitted discharges need to be restricted to the extent necessary to preserve that quality. Any cost/benefit analysis must consider whether additional affordable technology would assist in preserving the baseline quality. Absent a baseline, merely setting limits that achieve a quality at or slightly above the minimum required for all waters, as MPCA has done in this case, is an arbitrary and capricious method of determining what limits are necessary to protect existing water quality of this valuable water resource.

## V. Contested-case hearing

Because we have granted the relief sought by MCEA, we do not reach the alternative request for a contested-case hearing on the issues raised in this appeal. But we caution that if disputed issues remain following remand, MPCA should conduct a contested-case hearing to provide a fully developed record on which the board can make informed decisions.

## DECISION

Under Minnesota's nondegradation rules, the City of Princeton must analyze the prudence and feasibility of a downsized WWTP used in conjunction with accept-

able decentralized treatment to meet additional anticipated population growth before such an alternative can be rejected by the city and MPCA as not prudent or feasible. The MPCA must establish the existing water quality of the Rum River and impose necessary requirements and restrictions on Princeton's proposed WWTP to protect that quality.

**Reversed and remanded.**