Scott SAYER, et al., Appellants,

v.

MINNESOTA DEPARTMENT
OF TRANSPORTATION,
Respondent,

Flatiron–Manson, Respondent.

Nos. A08–1584, A08–1994.

Court of Appeals of Minnesota.

July 28, 2009.

Dean B. Thomson, Patrick J. Lee–O'Halloran, Jeffrey A. Wieland, Fabyanski, Westra, Hart & Thomson, P.A., Minneapolis, MN, for appellants.

Lori Swanson, Attorney General, Donald J. Mueting, Richard L. Varco, Jr., Assistant Attorneys General, St. Paul, MN, for respondent Minnesota Department of Transportation.

Thomas J. Vollbrecht, Faegre & Benson, LLP, Minneapolis, MN, for respondent Flatiron–Manson.

Considered and decided by SCHELLHAS, Presiding Judge; LARKIN, Judge; and MUEHLBERG, Judge.*

## OPINION

SCHELLHAS, Judge.

This appeal from summary judgment and denial of temporary injunctions arises from the commissioner of transportation's award of a construction contract. Appellants Scott Sayer and Wendell Anthony Phillippi argue that the contract was awarded illegally because the winning contractor submitted a nonresponsive proposal. We reject appellants' argument that the common-law definition of responsiveness applies to the design-build best-value method described in Minn.Stat. §§ 161.3410–.3428, and we conclude that under Minn.Stat. § 161.3426, subd. 1(a), the technical review committee (TRC) appointed by the commissioner to review proposals has discretion to determine the responsiveness of proposals. Because appellants fail to show that reversal of the TRC's findings is warranted, we affirm.

## FACTS

The I–35W bridge, which spanned the Mississippi river in Minneapolis, collapsed on August 1, 2007, resulting in the deaths of 13 people and injuries to many others. Three days after the collapse, respondent Minnesota Department of Transportation (MnDOT) began the process of replacing the bridge. The commissioner evaluated proposals for the bridge-construction contract using a design-build best-value procurement process. As required by this process, the commissioner issued a request for qualifications from contractors interested in undertaking the design and construction of the bridge and, after five qualifying contractors were identified, sent each qualifying contractor a request for proposal (RFP). The RFP contained detailed project-specific requirements. The commissioner later issued instructions to proposers (ITP), which stated that the contract would be awarded only to a proposal that met the standards established by MnDOT and described the weighted criteria by which the proposals would be evaluated. The commissioner appointed a six-member TRC to evaluate the proposals.

Four contractors, including respondent Flatiron–Manson, a Joint Venture, submitted proposals to MnDOT. After reviewing the proposals, the TRC submitted to the commissioner the technical scores it assigned to each proposal. The technical scores were accompanied by an itemized list of each proposal's score on the categories described in the ITP, with detailed comments for each score. Flatiron's proposal received the highest technical score, 95.30 out of 100 possible points. The next highest score was 71.40 out of 100. The TRC determined the adjusted scores for the proposals by adding the price and the delivery time of each proposal together, multiplying that number by $200,000, and then dividing the result by the proposal's technical score. Although Flatiron had the highest price and tied with another company for submitting the longest delivery time, its high technical score yielded the lowest adjusted score, constituting the "best value"; thus, Flatiron was awarded the contract on October 8, 2007.

On October 16, 2007, appellants filed a summons and complaint in their capacities as Minnesota taxpayers and private attorneys general against both MnDOT and Flatiron, seeking injunctive and declaratory relief on the ground that the TRC

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

should have rejected Flatiron's proposal as nonresponsive and that the commissioner therefore awarded the contract to Flatiron illegally. Appellants also moved for a temporary restraining order, and later for a temporary injunction, to prevent MnDOT from incurring additional costs or expenses under the contract. The district court denied each of appellants' motions in separate orders and awarded summary judgment to MnDOT and Flatiron. Appellants' separate appeals from the district court's orders have been consolidated. This appeal follows.

## ISSUES

I. Do appellants have standing and present a justiciable case?

II. Does the TRC have discretion, under Minn.Stat. § 161.3426, subd. 1(a), to determine whether a contractor's proposal responds to the specifications described in the RFP?

III. Did the TRC err in determining that Flatiron's proposal was responsive?

## ANALYSIS

### I

▆▆▆ Appellants brought the underlying action as Minnesota taxpayers and as private attorneys general. An individual has standing as a taxpayer to maintain an action to restrain a state from spending public money illegally. *McKee v. Likins,* 261 N.W.2d 566, 571 (Minn.1977). Because appellants allege that MnDOT illegally spent public money in awarding the I-35W bridge contract to Flatiron, we conclude that appellants' standing as taxpayers in this state is sufficient to bring this action.

▆▆▆ When the district court granted summary judgment to MnDOT and Flatiron, it observed that construction of the bridge was nearly complete at that time and determined that appellants' case was no longer justiciable. A case is moot if there is no longer a justiciable controversy for the court to decide. *Kahn v. Griffin,* 701 N.W.2d 815, 821 (Minn.2005). But a reviewing court will not deem a case moot if the case is "capable of repetition, yet likely to evade review." *Id.* And a reviewing court has discretion to decide issues that are technically moot when the issue is "functionally justiciable and is an important public issue of statewide significance that should be decided immediately." *Id.* at 821–22 (quotation omitted). "A case is functionally justiciable if the record contains the raw material (including effective presentation of both sides of the issues raised) traditionally associated with effective judicial decisionmaking." *State v. Rud,* 359 N.W.2d 573, 576 (Minn.1984). The record in this case is substantial and includes effective presentation of both sides of the issues raised. In addition, because the design-build statute is likely to influence the procurement of significant public projects in the future, we determine that the interpretation of Minn.Stat. §§ 161.3410–.3428 is an important issue of statewide significance, and we therefore conclude that appellants' case is not moot.

### II

▆▆▆ Central to this appeal and to the district court's grant of summary judgment is the issue of whether the design-build statute gives the TRC discretion in determining the responsiveness of a proposal. The interpretation of a statute presents a question of law and is reviewed de novo. *Harms v. Oak Meadows,* 619 N.W.2d 201, 202 (Minn.2000). When interpreting a statute, a reviewing court's primary objective is to ascertain and effectuate the intent of the legislature. *Scott v. Minneapolis Police Relief Ass'n,* 615 N.W.2d 66, 71 (Minn.2000). In doing so,

we first examine the statute's language to determine whether its meaning is plain. *Kellogg v. Woods,* 720 N.W.2d 845, 850 (Minn.App.2006). "If on its face a statute's meaning is plain, judicial construction is neither necessary nor proper." *Id.*; *see also* Minn.Stat. § 645.16 (2008) ("When the words of a law in their application to an existing situation are clear and free from all ambiguity, the letter of the law shall not be disregarded under the pretext of pursuing the spirit.").

 Generally, when the commissioner solicits contracting bids for construction work on trunk highways, the commissioner is required to award contracts to "the lowest responsible bidder, taking into consideration conformity with the specifications, the purpose for which the contract or purchase is intended, the status and capability of the vendor, and other considerations imposed in the call for bids." Minn.Stat. § 161.32, subd. 1b (2008). In the context of traditional competitive bidding, a public agency has a duty to reject those proposals that are not responsive, i.e., those that vary substantially from the advertised specifications. *Carl Bolander & Sons Co. v. City of Minneapolis,* 451 N.W.2d 204, 206 (Minn.1990). The traditional rule requiring competitive bidding for public contracts and substantial conformity to specifications serves the purpose of divesting public officials of any discretion in the selection process and to avoid "such abuses as fraud, favoritism, extravagance, and improvidence in connection with the letting of contracts." *Coller v. City of St. Paul,* 223 Minn. 376, 387, 26 N.W.2d 835, 841 (1947); *see also* Dean B. Thomson,[1] et al., *A Critique of Best Value Contracting in Minnesota,* 34 Wm. Mitchell L.Rev. 25, 26 (2007) (explaining that awarding public contracts on the basis of lowest price alone "safeguards the public from procurement fraud, favoritism, imprudence, and extravagance and ensures that public funds are expended in the wisest, most efficient, and least objectionable manner").

 But in 2001, the legislature enacted Minn.Stat. §§ 161.3410–.3428, which authorizes the commissioner to "solicit and award a design-build contract for a project on the basis of a best value selection process" for work on trunk highways. 2001 Minn. Laws 1st Spec. Sess., ch. 8, art. 3, § 2, at 2016. The best-value selection process differs from the traditional competitive-bid process in that it allows public agencies to consider factors other than cost when awarding contracts. Thomson, *supra,* at 26. The design-build method of procurement is also a departure from the traditional competitive-bid process in that the entity soliciting the contract seeks to enter into a single contract with a contractor for both the design and the construction of the project. *Sloan v. Greenville County,* 356 S.C. 531, 590 S.E.2d 338, 343 (Ct.App.2003); *see also* 2 Philip L. Bruner & Patrick J. O'Connor, Jr., *Bruner & O'Connor on Construction Law* § 6:15, at 517 (West Group 2002) (stating that the design-build approach is "defined primarily by the fact that the owner looks to a single entity for both the design and construction services"). In the traditional competitive-bidding situation, the design is typically completed when proposals for construction are requested. *See* Carl J. Circo, *Contract Theory and Contract Practice: Allocating Design Responsibility in the Construction Industry,* 58 Fla. L.Rev. 561, 565 (2006) (stating that, in the traditional situation, the soliciting entity contracts with an architect or engineer, who converts specifications into a detailed design, before soliciting bids for construction). In design-build

---

1. Dean B. Thomson represents appellants in this case.

procurement, the municipality solicits bids for design as well as construction, and therefore the design of the project is not fully defined when bids are solicited. Thomson, *supra*, at 62 ("Design-build, then, is a type of contract that is not based on fully defined specifications."); *see also Sloan*, 590 S.E.2d at 343 (noting that in design-build situations, design and construction often take place concurrently).

When the commissioner determines that the design-build best-value method is the appropriate means of awarding a contract, the commissioner is required to appoint a TRC of at least five members. Minn.Stat. § 161.3420, subd. 2. The TRC is required to score the technical proposals using the selection criteria that are defined in the RFP, to submit a technical score for each proposal to the commissioner, and to "reject any proposal it deems nonresponsive." Minn.Stat. § 161.3426, subd. 1(a). In this case, the RFP included an ITP, which stated that "Mn/DOT will conduct an initial review of the Technical Proposals for responsiveness to the requirements set forth in the RFP[.] ... Technical Proposals will ... require a minimum technical score of 50 points to be responsive." Because the TRC assigned Flatiron's proposal a technical score of 95.30, it determined that Flatiron's proposal was responsive.

Appellants argue that the common-law definition of a responsive proposal, i.e., as one that does not vary substantially from the advertised specifications, should apply here. *See Bolander*, 451 N.W.2d at 208 (determining that bid was nonresponsive on the ground that it materially deviated from specifications). Appellants also cite Minn.Stat. § 161.3426, subd. 1(a), which requires the TRC to reject nonresponsive proposals. Appellants claim that Flatiron's proposal was nonresponsive because it failed to comply with two specifications: first, that "[p]roposed work for this project

shall not include additional capacity or Right of Way"; and, second, that concrete-box designs feature "[a] minimum of three webs." Appellants argue therefore that the TRC should have rejected Flatiron's proposal.

Appellants are correct that section 161.3426 permits the award of contracts only to responsive proposals, as evidenced by the repeated use of the word "responsive" in that section. *See, e.g.,* Minn.Stat. § 161.3426, subds. 1(a) (requiring the TRC to reject "nonresponsive" proposals), 4(c)(1) (providing that the TRC must determine whether a proposal "complies with the requirements of the RFP and is responsive"). But section 161.3426, subdivision 1(a), provides that the TRC "shall reject any proposal it *deems* nonresponsive." (Emphasis added.) The definition of "deem" is "[t]o consider, think, or judge." *Black's Law Dictionary* 477–78 (9th ed. 2009). The plain language of section 161.3426, subdivision 1(a), as the district court correctly described, "clearly leaves the determination of the responsiveness of a proposal in the hands of the TRC." *See* Minn.Stat. § 645.16 (requiring a reviewing court to apply the plain meaning of a statute if its language is unambiguous).

Moreover, when the design-build process is used, the RFP for the proposals reviewed by the TRC does not contain fully detailed specifications. *See* Thomson, *supra*, at 62 (explaining that design-build contracts are not based on fully detailed specifications). The plain terms of the design-build statute indicate that the legislature's intent is to permit the TRC, by applying its judgment based on the advertised selection criteria, to evaluate proposals where no finished design exists to which the proposals must conform. We therefore reject appellants' argument that the common-law definition of responsive-

ness applies in the context of design-build best-value procurement and hold that, under section 161.3426, subdivision 1(a), the TRC has discretion in deciding whether a proposal is responsive.

## III

■■■■■ Our interpretation of the design-build statute does not allow the TRC to exercise unfettered discretion in determining whether a proposal is responsive. Generally, agency decisions enjoy a presumption of correctness, and judicial deference is owed to an agency's expertise and special knowledge in the field of their technical training, education, and experience. *Minn. Ctr. for Envtl. Advocacy v. Comm'r of Minn. Pollution Control Agency,* 696 N.W.2d 95, 100 (Minn.App.2005). But reversal of an agency decision is appropriate when the decision constitutes an error of law, when findings are arbitrary and capricious, or when the findings are unsupported by substantial evidence. *Id.* On appeal, appellants identify no error of law on MnDOT's part other than their argument that section 161.3426, subdivision 1(a), affords the TRC no discretion in evaluating the responsiveness of a proposal. We therefore proceed to determine whether the TRC's findings, on which it based its determination that Flatiron's proposal was responsive, were arbitrary and capricious or unsupported by substantial evidence.

First, appellants argue that the TRC should have rejected Flatiron's proposal because it involved work outside of the right-of-way defined in the RFP. Section 4.3.3.5.1 of the ITP states that "[p]roposed work for this project shall not include additional capacity or Right of Way." In this case, Flatiron's proposal required work outside the right-of-way defined in the RFP for the purpose of lowering Second Street. But Jon Chiglo, MnDOT's project manager for the I–35W bridge replace-

ment project, stated in his affidavit that this instruction was added after MnDOT received a request for clarification from another contractor that was planning to take additional right-of-way and add traffic capacity at or near the University Avenue and Fourth Street interchange. According to Chiglo, this plan would have required "more environmental review and more municipal consent." Chiglo stated that the instruction in section 4.3.3.5.1 of the ITP—to not include additional right-of-way in proposals—was limited in scope; the instruction was not a "[p]roject-wide directive to proposers on right-of-way limitations"; and neither the ITP nor the RFP forbade "any proposer from obtaining right-of-way on [Second] Street."

In support of Chiglo's interpretation of this instruction, we note that this instruction appears in a separate paragraph in section 4.3.3.5.1, and immediately follows a sentence prohibiting work on University Avenue, Washington Avenue, or Fourth Street outside the ramp termini. In its context, this instruction prohibits additional right-of-way only in those areas. We also note that book 2, section 7.5.4 of the RFP allows a contractor to submit a written request for consideration if the contractor "determines that additional [right-of-way] is necessary." This section requires the contractor to describe to MnDOT the location of the additional right-of-way needed and the justification for the need, and further requires the contractor to reimburse MnDOT for "all costs associated with such acquisitions." We conclude that the RFP did not prohibit proposals that required additional right-of-way in other areas, and reject appellants' argument that Flatiron's proposal was nonresponsive because it involved additional right-of-way on Second Street.

Second, appellants argue that Flatiron's proposal was not responsive because it

proposed a design that used concrete-box girders with only two webs each, contradicting the RFP's requirement that concrete-box designs use a minimum of three webs. Book 2, section 13.3.3.1.2 of the RFP states that "[a] minimum of 3 webs are required for concrete box designs." Flatiron's proposal included eight webs, four in each direction of traffic, but only two webs per concrete-box girder. Appellants argue that section 13.3.3.1.2 requires a minimum of three webs per concrete-box girder. But this section also states that for a steel-girder design, a minimum of three webs in each direction of traffic is required. The next sentence, which requires a minimum of three webs for concrete-box designs, presumably imposes equivalent design requirements on concrete-box designs. In this context, section 13.3.3.1.2 requires a minimum of three webs per direction of traffic for concrete-box bridge designs, not three webs per concrete-box girder. Flatiron's proposal exceeded this minimum requirement, and we therefore reject appellants' argument on this ground as well.

Appellants have failed to show that the TRC's findings, upon which Flatiron's proposal was determined to be responsive, were arbitrary and capricious or not supported by substantial evidence. Accordingly, we affirm the district court's grant of summary judgment to MnDOT and Flatiron. We therefore do not reach the issue of the district court's denial of appellants' motions for a temporary injunction.

## D E C I S I O N

Because the TRC had discretion under Minn.Stat. § 161.3426, subd. 1(a), to determine the responsiveness of proposals and because appellants fail to show that the TRC's findings were arbitrary and capri-

cious or unsupported by substantial evidence, we affirm.

**Affirmed.**