**ROCHESTER CITY LINES, CO., Appellant,**

v.

**CITY OF ROCHESTER, et al., Respondents,**

**First Transit, Inc., Respondent,**

**and**

**Daniel Holter, third party plaintiff, Appellant,**

v.

**Michael Wojcik, third party defendant, Respondent.**

**No. A13–1477.**

Court of Appeals of Minnesota.

April 7, 2014.

Review Granted June 17, 2014.

Gary Van Cleve, Rob A. Stefonowicz, Larkin Hoffman Daly & Lindgren, Minneapolis, Minnesota, (for appellants).

John M. Baker, Monte A. Mills, Greene Espel, P.L.L.P., Minneapolis, Minnesota, (for respondents City of Rochester, et. al.).

Charles K. Maier, Matthew G. Plowman, Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, Minnesota, (for respondent First Transit, Inc.).

Julie Fleming–Wolfe, Saint Paul, Minnesota, (for respondent Michael Wojcik).

Considered and decided by CONNOLLY, Presiding Judge; CHUTICH, Judge; and SMITH, Judge.

## OPINION

CONNOLLY, Judge.

Appellant, a longtime provider of transit services in the City of Rochester, challenges the summary-judgment dismissal of its claims arising out of the city's solicitation of bids and acceptance of a competing bid for transit services, arguing that the district court erred by determining as a matter of law that (1) the city did not take appellant's property without just compensation; (2) the bidding process was not unfair, prejudicially biased, and infected with organizational conflicts of interest; (3) the bidding process did not violate appellant's due-process rights; and (4) respondent Michael Wojcik did not defame appellant. We affirm.

## FACTS

Appellant Rochester City Lines (RCL) has operated a fixed—route transit service in respondent City of Rochester since 1966. In 1975, RCL began receiving subsidies from the city. In 1977, the city began receiving federal transit financial assistance. Some of these funds were used for capital improvements-including buses which were then leased to RCL—and to subsidize fares. As of 2010, approximately 26% of the cost of the system came from rider fares and other revenues collected directly by RCL, 8% from corporate sponsorships, and 65% from federal, state, and local subsidies.

In 1979, the city granted RCL a five-year nonexclusive regulatory franchise to operate a fixed-route transit system within the city. This franchise was continuously renewed from 1979 through December 31, 2011. In 2010, however, the Federal Tran-

sit Administration (the FTA) determined that the contract between RCL and the city needed to be competitively bid to comply with federal transit aid requirements.[1] In December 2011, the city granted RCL a six-month nonexclusive franchise, set to expire on June 30, 2012, and issued a request for proposals (the RFP) to provide publicly subsidized fixed-route bus service in Rochester beginning July 1, 2012 through December 31, 2016.

The city received responsive bids from four companies, including RCL and respondent First Transit. After reviewing the proposals, the city determined that First Transit's proposal represented the "best-value" for the city and awarded it the contract. First Transit commenced operations on July 2, 2012. Although the city granted RCL a nonexclusive franchise to continue operating an unsubsidized fixed-route transit system, RCL ceased all fixed-route operations on July 3, 2012. It continued to provide commuter and charter bus services.

RCL commenced this litigation on February 14, 2012. Its complaint requested (1) declaratory judgment stating that RCL was the "owner" of the transit system and the only entity with a legal right to operate that system, and that the RFP was unlawful and must be terminated; (2) injunctive relief ordering the city to cancel the RFP and renew RCL's franchise for five years; and (3) a writ of mandamus ordering the city to commence condemnation proceedings. On February 29, the district court denied the request for injunctive relief.

On June 6, 2012, RCL filed an amended complaint, adding a contract-award bid-protest appeal; a claim of defamation against Rochester Common Council member Michael Wojcik; claims for violations of 42 U.S.C. §§ 1983 and 1988, and 49 U.S.C. § 5323; substantive- and procedural-due-process claims; and a third-party complaint by RCL's owner Daniel Holter for defamation against Wojcik. On June 25, RCL moved for a temporary injunction staying the city's decision on its bid-protest appeal, enjoining the approval and execution of the contract with First Transit, enjoining the grant of a franchise to First Transit, and enjoining First Transit from commencing operations.

The district court denied the request for a temporary injunction. On November 2, 2012, it issued an order granting summary judgment in favor of the city and First Transit on the reverse-condemnation claim and in favor of Wojcik on the defamation claim. And on June 7, 2013, it issued an order granting summary judgment in favor of the city and First Transit on all remaining claims. Judgment was entered on June 10, 2013.

This appeal follows.

## ISSUES

I. Did the district court err when it concluded that no taking had occurred and granted summary judgment in favor of respondents on appellant's inverse-condemnation claim?

II. Did the district court err when it concluded that no evidence supports RCL's bid-protest claim?

III. Does a bidder have a protectable property interest in being awarded a public contract if its proposal represents the "best value" for the awarding entity?

IV. Did the district court err in granting summary judgment for respondents

---

1. The district court's order states that the FTA directive was issued in 2011, but the record shows that the initial determination was made in 2010, while a series of appeals took place through 2011.

because Wojcik's statements are not actionable defamation?

## ANALYSIS

"On an appeal from summary judgment, we ask two questions: (1) whether there are any genuine issues of material fact and (2) whether the [district court] erred in [its] application of the law." *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn.1990). The district court must grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03.

Because the "district court's function on a motion for summary judgment is not to decide issues of fact, but solely to determine whether genuine factual issues exist ... the [district] court must not weigh the evidence." *DLH, Inc. v. Russ,* 566 N.W.2d 60, 70 (Minn.1997). The district court must view the evidence in the light most favorable to the nonmoving party, and "[a]ll doubts and factual inferences must be resolved against the moving party." *Nord v. Herreid,* 305 N.W.2d 337, 339 (Minn.1981). But the district court "is not required to ignore its conclusion that a particular piece of evidence may have no probative value, such that reasonable persons could not draw different conclusions from the evidence presented." *DLH, Inc.,* 566 N.W.2d at 70.[2]

### I.

RCL alleges that the city "took RCL's privately-owned transit system, claimed it as its own, put it out for competitive bid, awarded it to another transit company to operate and failed and refused to pay RCL just compensation for the taking." The Minnesota and United States Constitutions prohibit the governmental taking of private property without the payment of just compensation. U.S. Const. amend. V ("[No] private property [shall] be taken for public use without just compensation"); Minn. Const. art. I, § 13 ("Private property shall not be taken, destroyed or damaged for public use without just compensation."). The Minnesota Constitution provides broader protections than the U.S. Constitution. *DeCook v. Rochester Int'l Airport Joint Zoning Bd.,* 796 N.W.2d 299, 301 (Minn.2011).

Inverse condemnation is "a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency." *Alevizos v. Metro. Airports Comm'n of Minneapolis & St. Paul,* 298 Minn. 471, 477, 216 N.W.2d 651, 657 (1974) (quotation omitted). To prevail in an inverse-condemnation action, the plaintiff must establish that the government actor interfered with ownership, possession, or enjoyment of a property right. *Oliver v. State ex rel. Comm'r of Transp.,* 760 N.W.2d 912, 915 (Minn. App.2009), *review granted* (Minn. Apr. 29, 2009) *and appeal dismissed* (Minn. Nov. 16, 2009) (noting that the petition for further review was "improvidently granted"). Whether a taking has occurred is a question of law, which we review de novo. *C &*

---

**2.** First Transit asserts that, because it moved for summary judgment partly on the ground that no claims had been raised against it, and because RCL has not responded to this argument on appeal, the district court's judgment must be affirmed as to First Transit. The district court did not address this reasoning in its memoranda. Because we conclude that summary judgment must be affirmed on other grounds, we do not reach this argument.

*R Stacy, LLC v. Cnty. of Chisago*, 742 N.W.2d 447, 457 (Minn.App.2007).

RCL argues that the district court "ignored abundant evidence confirming RCL's ownership of the transit system, disregarded well-established takings law, and permitted the city's uncompensated takeover of RCL's system by labeling it 'competition.'" RCL does not appear to assert that the city's actions deprived it of any tangible property—indeed, the undisputed evidence indicates that, at least as of the time the city issued the RFP in 2012, the city owned most of the physical components of the public transit system operated by RCL, including "the buses, radio system, security cameras, bus-stop benches, bus-stop signs, and bus-stop shelters." But RCL argues that it is entitled to compensation for intangible property, including "[r]outes, schedules, 'going concern' value, as well as operating system, operating rights, permits, franchise, records, procedures, trained personnel, and other … intangible property."

■ RCL argues at length that this intangible property is compensable under Minnesota takings law. This issue is irrelevant under the facts of this case, however, because the issue of what compensation is due comes second to the issue of whether a taking occurred. And nothing in our caselaw or the record supports RCL's argument that the city's act of placing the contract to operate a publicly subsidized transit system up for competitive bidding interfered with RCL's property rights in its transit system.[3]

The record shows that, after the city awarded the contract to First Transit, RCL remained in possession of all of the intangible property that made up its private transit system, as well as any tangible property that was not owned by the city. It retained its franchise to operate within the city. And it retained its right to continue to operate as a "going concern." RCL operated its transit system from 1966 until 1975 without public subsidies. RCL does not allege that the city has blocked it from continuing operations without public subsidies, and indeed, it did so for one day before ceasing its fixed-route operations in Rochester.

RCL relies on regulatory takings cases for the proposition that compensation is required "solely upon a showing that the public regulatory action deprives the landowner of 'all economically beneficial or productive use' of its land." *614 Co. v. Minneapolis Cmty. Dev. Agency*, 547 N.W.2d 400, 406 (Minn.App.1996) (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992)). But nothing in the record indicates that the city took any regulatory action that resulted in depriving RCL of "all economically beneficial or productive use" of its property. *Id.* The bidding process determined which company would receive federal, state, and city subsidies, to which RCL does not argue it had any right in perpetuity. The city's actions deprived RCL of those public subsidies, but did not deprive it of the productive use of its property. Instead, because of the nature of operating fixed-route transit systems, RCL was incapable of competing in the market without those subsidies.[4]

---

3. RCL cites to a number of New York cases where courts held that a taking occurred, but none of them turned on the awarding of a public contract.

4. RCL also asserts that the city is in violation of 49 U.S.C. § 5323(a)(1) (2012), which states

that federal financial assistance may be used "to operate a public transportation facility or equipment in competition with, or in addition to, transportation service provided by an existing public transportation company, only if … just compensation under [s]tate or local law will be paid to the company for its fran-

In the absence of a governmental taking of private property, the district court correctly concluded that RCL's inverse-condemnation claim fails as a matter of law and granted summary judgment in favor of respondents.

## II.

RCL argues that the district court erred when it granted summary judgment on its bid-protest appeal. It asserts that the district court erred when it concluded that, as a matter of law, the bidding process was not unfair, prejudicially biased, and infected with organizational conflicts of interest. It also asserts that the district court "engaged in impermissible fact-finding," "impermissibly weighed evidence and failed to view evidence in a light most favorable to RCL."

■■■ The awarding of a contract by the city is an "administrative act of discretion." *Nielsen v. City of St. Paul*, 252 Minn. 12, 18, 88 N.W.2d 853, 858 (1958). But if a government entity is either required by statute or elects to follow a competitive-bidding process, that entity is "required, as long as that method [has] not been seasonably abandoned, to pursue such method in a manner reasonably designed to accomplish its normal purpose of giving all contractors an equal opportunity to bid and of assuring to the taxpayers the best bargain for the least money." *Griswold v. Ramsey Cnty.*, 242 Minn. 529, 535, 65 N.W.2d 647, 652 (1954). Minnesota public-procurement law holds that "a contract entered into in violation of competitive bidding laws is void." *Rochon Corp. v. St. Paul*, 814 N.W.2d 365, 369 (Minn.

App.2012), *review denied* (Minn. July 17, 2012). "[A] competitive bidding contract is void even without any showing of actual fraud or an intent to commit fraud, if a procedure has been followed which emasculates the safeguards of competitive bidding." *Id.* (quotation omitted).

As a threshold matter, we must determine how the "best value" process adopted here fits into the common-law competitive-bidding framework. The district court found that where, as here, the awarding of a contract includes the weighing of subjective factors, there arises an inherent "potential for unfairness," but that this potential "does not render the 'best value' process illegal." We agree, and the parties do not argue otherwise. The question remains, however, to what extent Minnesota's competitive-bidding caselaw applies in a best-value context.

■■■ Much of Minnesota's competitive-bidding caselaw comes from the lowest-responsible-bidder context, in which "the only function of the public authority with respect to bids after they have been received shall be to determine who is the lowest responsible bidder." *Coller v. City of St. Paul*, 223 Minn. 376, 385, 26 N.W.2d 835, 840 (1947). The government entity has no discretion in awarding the contract; once it has decided to award the contract, "the lowest responsible bidder in compliance with the bidding specifications and procedures has a legitimate expectation in being awarded the contract." *Schwandt Sanitation of Paynesville v. City of Paynesville*, 423 N.W.2d 59, 66 (Minn.App. 1988) (quotation omitted). These cases also contain strong language concerning

---

chise or property." As observed by the district court, RCL "is not asserting a private right of action under the federal statute." And RCL does not clarify what relevance this statute has to the issue of whether the city's actions constitute a taking beyond the bare

assertion that the city is in violation of the statute. Given this lack of briefing, we do not address RCL's discussion of section 5323(a)(1). *See Melina v. Chaplin*, 327 N.W.2d 19, 20 (Minn.1982).

the policies behind competitive bidding. *See Gale v. City of St. Paul*, 255 Minn. 108, 114, 96 N.W.2d 377, 381 (1959) ("It is the potential of wrongdoing afforded by the ambiguity which is objectionable and which could stifle competition through favoritism."); *Rochon Corp.*, 814 N.W.2d at 368 ("A central reason for competitive bidding is to eliminate an official's discretion on matters open to fraud, favoritism, folly and extravagance.").

The closest that Minnesota courts have come to distinguishing the lowest-responsible-bidder process from the best-value process is in *Sayer v. Minn. Dep't of Transp.*, 769 N.W.2d 305 (Minn.App.2009). In that case, this court affirmed the district court's grant of summary judgment on the ground that the statute authorizing the use of a design-build best-value process, Minn.Stat. § 161.3426 (2008), granted the contracting agency discretion in determining the responsiveness of a proposal. *Sayer*, 769 N.W.2d at 310–11. The supreme court affirmed, but did not reach the issue of whether the common-law definition of responsiveness applies to the design-build best-value procurement process. Instead, the supreme court concluded that the bid at issue was responsive to the RFP. *Sayer v. Minn. Dep't of Transp.*, 790 N.W.2d 151, 160 (Minn.2010).

In a concurrence, Chief Justice Gildea, joined by Justice Dietzen, determined that there was a genuine issue of material fact regarding whether the bid was responsive under the common-law standard. *Id.* at 165 (Gildea, C.J., concurring). But the Chief Justice concluded that the common-law standard of nonresponsiveness did not apply because Minn.Stat. § 161.3426 did not require the contracting body to link responsiveness to the RFP criteria. *Id.* at 166. This conclusion implies that the legislature may statutorily exempt public contracts from certain requirements of the common-law competitive-bidding law, specifically responsiveness. *See id.*

Although the majority in *Sayer* did not reach the question of whether the common-law standard of responsiveness applied, it did note that the design-build best-value process "differs from the lowest responsible bid process in that it allows public agencies to consider factors other than cost when awarding contracts." *Id.* at 156 (majority opinion). The parties here have not identified a relevant statutory provision concerning use of the best-value method in this instance, but Chief Justice Gildea's reasoning, and common sense, remain relevant to the extent that a best-value process inherently allows a greater amount of discretion to the contracting entity than the lowest-responsible-bidder process by allowing the entity to consider factors beyond price.

Our caselaw has identified a number of circumstances in which a contracting entity violates the general principles of competitive bidding. A contracting entity may not allow a bidder to modify its bid after bids are closed. *Coller*, 223 Minn. at 387, 26 N.W.2d at 841; *Rochon Corp.*, 814 N.W.2d at 369. A contracting entity may not adopt a procedure allowing it to materially change the contract up to six months after letting of the basic contract by adopting an alternative proposal of the successful bidder. *Griswold*, 242 Minn. at 536–37, 65 N.W.2d at 652. The terms of a bid specification must be "sufficiently definite and precise to afford a basis for bids and they must be free from restrictions the effect of which would be to stifle competition." *Gale*, 255 Minn. at 114, 96 N.W.2d at 381.

More recently, Minnesota courts have held that a contracting entity must reject a bid if there is a substantial variance between the bid and the bid request. *Tel. Assocs., Inc. v. St. Louis Cnty. Bd.*,

350 N.W.2d 398, 400–01 (Minn.App.1984), *aff'd*, 364 N.W.2d 378 (Minn.1985). And a contacting entity must abide by its own established guidelines in issuing a request for proposals and awarding a contract. *Transit Team, Inc. v. Metro. Council*, 679 N.W.2d 390, 397 (Minn.App.2004). None of our caselaw suggests that these are the only scenarios in which a contract is entered into in violation of competitive bidding laws.

In at least two instances other than *Sayer*, Minnesota courts have applied common-law competitive-bidding requirements to a best-value process. In *Telephone Associates*, the contract at issue was to be awarded to the vendor "providing best value." 350 N.W.2d at 400. Fifty percent of the best-value determination was based on a single factor, determined through an equation comprised of a number of elements. *Id.* The winning bidder failed to submit a value for one element, but rather than rejecting the bid as unresponsive, the contracting entity averaged the values submitted by the other two bidders and inserted that number into the winning bid. *Id.* The supreme court concluded that this procedure allowed the winning bidder a substantial advantage over the other bidders, and that the contracting entity should have rejected the bid for failing to substantially conform to the advertised plans and specifications. *Id.* at 400–01.

In *Transit Team*, this court examined a contract award based on a combination of "numerous factors, including a new fleet, a strong staffing plan, best value for price, and company experience both locally and nationally." 679 N.W.2d at 397. We determined that although price was a factor, it was not "an exclusive factor," as argued by appellants. *Id.* And we concluded that the contracting entity complied with its stated standards and guidelines in issuing the RFP and in awarding the contract, and

that the winning proposal did not materially vary from the requirements of the RFP. *Id.*

We conclude that principles of common-law competitive-bidding law apply to a best-value process where, as in *Telephone Associates* and *Transit Team*, the application of those principles does not undermine the discretion inherent to the best-value process. But where those principles clearly conflict with that discretion, our analysis must be tempered by a necessary deference to that discretionary grant. *See Nielsen*, 252 Minn. at 18, 88 N.W.2d at 858 (noting that the awarding of a contract by the city is an "administrative act of discretion").

■■■ RCL argues that the city violated the principles of competitive bidding through pervasive bias in its administration of the solicitation, evaluation of proposals, and award of the contract. RCL's discussion of these issues largely focuses on the district court's failure to comply with the summary-judgment requirement that the court not weigh evidence and view the evidence in the light most favorable to the nonmoving party. It concludes that this failure "resulted in reversible error." We note, however, that "we may affirm a grant of summary judgment if it can be sustained on any grounds." *Doe v. Archdiocese of St. Paul*, 817 N.W.2d 150, 163 (Minn.2012). Even if the district court improperly weighed the evidence when reaching its conclusion, we will not reverse "if there are no genuine issues of material fact and if the decision is correct on other grounds." *Winkler v. Magnuson*, 539 N.W.2d 821, 827 (Minn.App.1995) (quotation omitted). Because we conclude that RCL has failed to present sufficient evidence for a reasonable fact-finder to conclude that the bid process and award violated the principles of competitive bidding,

we do not reach RCL's procedural complaints.

## A. Rochester's bid process

On December 28, 2011, the city issued an RFP seeking vendors to operate a publicly subsidized fixed-route transit system within Rochester. This process was commenced in compliance with the Federal Transit Authority's third-party contracting guidelines, which allow a recipient of federal transit funding to award a related contract on a best-value basis, as long as the process is permitted under state or local law and the solicitation identifies which factors will form the basis for the award.[5] The recipient is instructed to award the contract based on "an analysis of the tradeoff of qualitative technical factors and price or cost factors," but the guidelines "do[ ] not require any specific factors or analytic process," other than a requirement that the "contract must support the recipient's public transportation project consistent with applicable [f]ederal laws and regulations." Fed. Transit Admin., Circular 4220.1F, *Third Party Contracting Guidance,* at VI–11 (2009) (hereinafter FTA Circular).

The city created an evaluation committee consisting of four city officials (three from the department of public works and one from the finance department) and four transit professionals from outside organizations (two from the Minnesota Department of Transportation and two from other publicly owned transit systems). The city also hired technical assistance firm RLS & Associates to ensure that the bid process followed FTA third-party-contracting guidelines.

Proposals were evaluated in four weighted categories: technical criteria (40%), interviews with key management staff (30%), past performance and reference checks (20%), and financial ability (10%). The technical criteria category was further broken down into six subcategories, each making up 10–20% of the total value of that category. Each vendor was also required to submit a price proposal. Each member of the evaluation committee separately evaluated the technical proposals, and their scores were then confidentially tabulated by RLS & Associates.

The city hired McGladrey & Pullen LLP to evaluate the required financial data and opine whether the vendors met the requirements of the RFP and to identify any areas of concern. Its report was distributed to the evaluation committee, which scored this portion on a pass/fail basis. These scores were tabulated along with the scores for the interviews and reference checks, and the vendors were assigned a rank order. First Transit was ranked in first place, with RCL in fourth place. Price proposals were opened after completion of technical scoring. First Transit offered the lowest price proposal, with RCL offering the second lowest. Based on these factors, the evaluation committee determined that First Transit's proposal represented the best value for the city.

## B. Evidence of city bias

RCL argues that it presented sufficient evidence to show pervasive bias in the city's administration of the RFP, evaluation of proposals, and award of the operating contract. In some instances, RCL concedes that a particular complaint, standing alone, would be insufficient to void First Transit's contract with the city. But RCL argues that we should view these incidents as a whole, and should conclude

---

5. The parties do not dispute that this process is authorized under state and local law.

that the process violated the purposes of competitive-bidding law.[6]

### 1. Failure to comply with established standards and guidelines

██ Although RCL framed its complaint broadly as "city bias," certain allegations relate to a purported failure of the city to abide by established standards and guidelines. "[T]he competitive bidding method undertaken by the city cannot be arbitrary, capricious, or unreasonable but must follow the standards the city has set out." *Schwandt Sanitation of Paynesville*, 423 N.W.2d at 64. "If the guidelines are substantially followed, minor defects in the procurement process will not be sufficient to void a contract into which the parties have already entered." *Transit Team*, 679 N.W.2d at 396.

### a. Organizational conflicts of interest

RCL alleges the existence of two categories of organizational conflicts of interest (OCI) concerning the conduct of the city and First Transit. "First, there was an OCI arising out of the interview process irregularities; second, there was an OCI arising out of the suborning of RCL's two key management figures." The FTA's contracting guidelines, adopted in the RFP, prohibit "[e]ngaging in practices that result in organizational conflicts of interest." FTA Circular at VI–4, VI–5.

An OCI exists when "because of other activities or relationships with other persons, a person is unable or potentially unable to render impartial assistance or advice to the [g]overnment, or the person's objectivity in performing the contract work is or might be otherwise impaired, or a person has an unfair competitive advantage." 48 C.F.R. § 2.101 (2013). The FTA guidelines define three circumstances which give rise to an OCI, including (1) lack of impartiality or impaired objectivity, (2) unequal access to information, and (3) biased ground rules. FTA Circular at VI–5.

"Conflicts may arise in situations not expressly covered" by federal rules or guidance. 48 C.F.R. § 9.505 (2013). The underlying principles are "[p]reventing the existence of conflicting roles that might bias a contractor's judgment," and "[p]reventing unfair competitive advantage." *Id.* An OCI may result either from an "actual or potential conflict of interest." 48 C.F.R. § 9.502(c) (2013). But "[a]n OCI must be established by 'hard facts' that indicate the existence or potential existence of a conflict." *Turner Constr. Co., Inc. v. United States*, 94 Fed.Cl. 561, 573 (2010), *aff'd*, 645 F.3d 1377 (Fed.Cir.2011).

Although RCL argues that the district court improperly weighed evidence, it does not identify any genuine issues of material fact. And RCL has failed to present evidence sufficient for a reasonable person to conclude that an actual or potential conflict of interest exists. *See DLH, Inc.*, 566 N.W.2d at 70. RCL recognizes that its arguments do not fit into the established OCI framework. It argues, however, that this framework "relate[s] to types of relationships between incumbent contractors and an FTA grant recipient," but does not preclude "other unfair relationships that disadvantage other competitors" from establishing an OCI.

**6.** Several of RCL's arguments concern requirements in the RFP. The city asserts that these arguments have been waived by RCL's failure to raise these issues in an earlier protest before the deadline for proposals had passed. We will consider RCL's arguments to the extent that they support RCL's ultimate assertion that the process as a whole violated the purposes of competitive-bidding law.

458

RCL asserts that it provided evidence showing that "First Transit possessed an unfair competitive advantage, and that the advantage accrued as the result of its activities or relationships with the [c]ity," and states that this evidence is sufficient to defeat summary judgment. But it presents no specific arguments concerning how the "gross interview irregularities" it asserts constitute a fatal OCI. A party seeking to defeat summary judgment must do more than present evidence "which merely creates a metaphysical doubt as to a factual issue." *Id.* at 71. And aside from general statements of law, it provides no legal support for the conclusion that the evidence it presents constitutes either an OCI or the appearance of an OCI.

RCL does not dispute that the knowledge possessed by First Transit's staff concerning the city's hiring preferences was also possessed by RCL, as well as more generally by all bidders, as the RFP included the requirement that the winning bidder "make a good faith effort to hire employees from the . . . incumbent [c]ontractor." RCL focuses on an incident in which a city official informed a First Transit representative that RCL's operations manager was "someone who we like." But RCL does not argue that this information was nonpublic or that it was obtained in a questionable way. It simply asserts that because the city was willing to give First Transit this information-information RCL was previously aware of-that this gives rise to the appearance that the city was colluding with First Transit. On appeal from a grant of summary judgment, this court is not required "to ignore its conclusion that a particular piece of evidence may have no probative value, such that reasonable persons could not draw different conclusions from the evidence presented." *Id.*

RCL also asserts that the "suborning" of two management employees, who agreed to be listed on First Transit's bid while still employed by RCL, constitutes either an OCI or the appearance of an OCI. Again, it offers little more than "mere averments" to support this contention. *See* Minn. R. Civ. P. 56.05 ("When a motion for summary judgment is made . . . an adverse party may not rest upon the mere averments or denials of the adverse party's pleading but must present specific facts showing that there is a genuine issue for trial."). The evidence presented could support the claim that a conflict existed between the two companies, or between RCL and its employees, but provides no support for the claim that the city was involved in this "subordination," or that, as a result, First Transit was placed in a position of advantage over RCL in the bidding process.

RCL asserts that the district court misapplied the law when it limited its discussion of OCIs to the three examples identified by the FTA in its published guidelines, because "[c]onflicts may arise in situations not expressly covered" by federal rules or guidance. 48 C.F.R. § 9.505. Our reading of the district court's opinion does not lead us to conclude that it recognized section 9.505 "in principle, if not in application." And even if the district court's analysis did focus largely on the FTA guidelines, RCL has provided no legal or evidentiary support for its conclusion that the type of activity it presents creates an actual or potential conflict of interest either through the creation of "conflicting roles that might bias a contractor's judgment," or by allowing First Transit an "unfair competitive advantage." *Id.*

It could be argued that RCL has presented evidence that might suggest some general unfairness in the bid process, or a

private dispute between itself and First Transit. But it has failed to present either "hard facts" or legal support for the conclusion that any unfairness or appearance of unfairness in a bid process constitutes an OCI, or that any resulting deviation from the RFP is sufficient to void First Transit's contract with the city. *Cf. Transit Team,* 679 N.W.2d at 396.

### b. Excessive qualifications

▆ RCL asserts that the "RFP imposed excessive qualifications, experience and financial requirements that favored the three international proposers competing against hometown, family-owned RCL, and that were irrelevant to judging RCL's ability to perform in the face of its successful 46-year history of owning and operating the Transit System." The FTA guidelines prohibit "solicitation requirements that contain features that unduly restrict competition," including "[i]mposing unreasonable business requirements," or "[i]mposing unnecessary experience requirements." FTA Circular at VI–3.

RCL argues that the proposal required "unreasonable—and unavailable to RCL—levels of cash reserves," which it asserts was evidence that the city aimed to disadvantage RCL and other smaller companies. It argues that the requirement of references from at least three cities was selected specifically to disadvantage RCL, which had—as the city knew—operated only in Rochester. It argues that the city showed bias by refusing to consider RCL's experience in Rochester, which, it asserts, was "the only reasonable purpose for such a requirement." And RCL asserts that the directive in the RFP instructing the winning bidder to "make a good faith effort to hire employees from the [city's] incumbent [c]ontractor," along with the city's role in recommending management personnel to First Transit, are evidence of city bias against RCL.

RCL's arguments call into question the city's discretion to determine what constitutes "best value" for the city. Therefore, we review the requirements of the RFP for an abuse of discretion, and conclude that RCL has failed to present evidence sufficient for a reasonable fact-finder to conclude that the city abused its discretion in determining what business and financial requirements were necessary to provide best value to the city.

Again, RCL argues that the district court improperly weighed the evidence, but provides no argument concerning the existence of any genuine issue of material fact. RCL has presented no evidence that the RFP requirements were unreasonable or unnecessary, except for the fact that RCL itself had difficulty meeting some of those requirements. And there is nothing in the record, or our caselaw, to suggest that a contracting entity imposes unreasonable or unnecessary requirements because it seeks qualifications that may be beyond the capacity of its current contractor.

### c. Interview irregularities (participation and scoring)

▆ RCL argues that "the district court improperly evaluated and analyzed the evidence of the flawed interview and scoring process when it concluded that these flaws were 'more molehill than mountain.'" In a memorandum released to the bidders, the city stated that the interview portion of the evaluation would involve a vendor panel of a "[m]aximum [of] five members, with mandatory attendance of proposed General Manager, Operations Supervisor, and Maintenance Supervisor."

When contacted by bidder MC Transportation with a request to switch out one individual during the interview in order to operate a PowerPoint presentation, the

city transit and parking manager replied that the city "will not allow them to switch out personnel during the interview process." When contacted by First Transit, however, the city granted such a request.

First Transit was concerned because two of the required members of its team—their general manager and maintenance supervisor—were employees of RCL who had agreed to work for First Transit in the event that it received the contract. First Transit asked to bring their current managers, instead of the proposed managers, to which the city responded that "it seems a respectful way to handle it and to make sure to communicate this to the interview board." The two managers in question interviewed with RCL, but some evaluators credited their responses to First Transit as well as RCL.

RCL points to testimony from the city's technical consultant that the way the committee scored First Transit's interviews "should not have happened but there was no written guidance that [the consultant] proffered that stated 'do not do that.'" RCL characterizes this testimony as "damning," and asserts that there is a triable issue of fact on whether "this impropriety, coupled with many others, show[s] an unfair, biased and predeterminative process."

Viewed in the light most favorable to RCL, it does appear that the city deviated from its standards and guidelines when it allowed First Transit an exemption from the "mandatory attendance" of two of its proposed managers. RCL does not assert that these interview incidents alone are sufficient to render the contract void, and does not dispute the evidence that any advantage gained in the scoring of the interviews did not have a material effect on First Transit's overall score. To the contrary, the record compels the conclusion that these are no more than "minor defects in the procurement process . . . [in]sufficient to void a contract into which the parties have already entered." *Transit Team*, 679 N.W.2d at 396.

## 2. Proposal scoring

RCL asserts that its scores from the evaluation committee provide "additional cumulative indications of a pervasively defective and biased bid process." It asserts that a genuine issue of material fact exists as to its financial ability to operate the public transit system because of its demonstrated ability to operate that system in the past. In light of this demonstrated ability, it asserts that it was arbitrary and capricious for the evaluation committee to give RCL only "half credit" for its financial capability. And it asserts that, because it was not required to make any transition into assuming operation of the transit system, it should have received full scores on this factor. Again, RCL does not assert that these scoring issues alone were sufficient to render First Transit's contract void.

On this record, RCL has failed to meet its burden to establish that a reasonable fact-finder could conclude that the city abused its discretion on the scoring factors. In fact, the evaluation committee members from the city, on average, scored RCL higher than the committee members from outside organizations. The RFP indicates that the city sought an improvement on its current transit system, and the undisputed evidence shows that, in some areas, RCL could not meet the qualifications that the city sought. Like the excessive-qualifications argument discussed above, RCL has presented no support for the assertion that a contracting entity abuses its discretion by requiring qualifications beyond the capabilities of its incumbent contractor.

### 3. Bias from city officers

██ RCL raises a series of arguments as to specific acts by city officials that it asserts demonstrate bias. It does not assert that any one of these acts, standing alone, is sufficient to render the contract void. It first asserts that the city's bid-protest decision-maker had an inherent conflict of interest because, as the city attorney, he also "advised and counseled the [c]ity on all aspects of the RFP and bidding process." RCL argues that due to this conflict of interest, he was not an impartial decision-maker as required by *Ginsberg v. Minn. Dep't of Jobs & Training*, 481 N.W.2d 138, 141 (Minn.App.1992) ("Due process requires a decision by an impartial official; an official who has been involved in the particular aspect of a case under review should not also participate in the decisionmaking process."), *review denied* (Minn. Apr. 9, 1992).

RCL also asserts that the common council members showed "overt animus and hostility toward RCL and its general manager Holter for seeking a corporate profit." RCL points to the statements from common council member Wojcik in December of 2011, shortly before the city issued the RFP and discussed in more depth below, in particular his public statements that Holter's actions constituted "extortion."

RCL argues that the common council's failure to conduct a de novo review of RCL's bid protest was a sign of bias. And, finally, it argues that city transit officials demonstrated bias when they agreed to be named as references in RCL's bid proposal, then later declined to provide those references after being named to the evaluation committee.

██ RCL has presented no support, aside from mere averments, for its claim that the city attorney was legally barred from overseeing the initial bid protest, or

that the common council was required to conduct a de novo review of RCL's protest. Instead, it presents these facts as evidence of a pervasive bias on the part of the city against RCL. As a matter of law, statements by a council member do not reflect a biased intent by the council as a whole. *See Queen City Constr., Inc. v. City of Rochester*, 604 N.W.2d 368, 377 (Minn.App. 1999) ("[E]ven if members of the Common Council ... made the statements attributed to them by the affiants, such statements would not be evidence of the intent of the Common Council as a whole."), *review denied* (Minn. Mar. 14, 2000). As for the city officials neglecting to inform RCL of their decision not to provide references, it is not clear how this is a defect in the procurement process rather than a failure on the part of those individuals. The record, again, compels the conclusion that these are, at most, "minor defects in the procurement process [which] will not be sufficient to void a contract into which the parties have already entered." *Transit Team*, 679 N.W.2d at 396.

### C. Pervasive bias

██ RCL concludes that the evidence described above, taken as a whole, demonstrates a pervasive bias "which emasculates the safeguards of competitive bidding" and renders First Transit's contract with the city void. *See Rochon Corp.*, 814 N.W.2d at 369. As discussed in the sections above, however, RCL failed to present evidence sufficient for a reasonable fact-finder to conclude that the city deviated from its established guidelines in any significant way, or that it abused its discretion in setting or evaluating the criteria used to determine best value.

At best, RCL's arguments illuminate the reality that a best-value process might not be as free from the perception of bias as in

a lowest-responsible-bidder contest. The city's discretion was not limited to determining the lowest responsible bidder; that discretion extended to administering a process requiring a number of subjective determinations. Among these was the selection of the criteria used to award points, the determination that the contract would require a bidder to meet higher standards than had been required of the incumbent in the past, and the scoring of points based on individual impressions of interviews.

We conclude that a reasonable fact-finder could only find that the process adopted by the city accomplished the purpose "of giving all contractors an equal opportunity to bid and of assuring to the taxpayers the best bargain for the least money." *Griswold*, 242 Minn. at 535, 65 N.W.2d at 652. The city instituted a series of balancing mechanisms and redundancies, including appointing an eight-person committee consisting of half outsiders and half city officials, evaluating bidders on a range of criteria, blind scoring of most criteria, separate evaluation of price proposals, and averaged tabulation by a neutral party. Not only did First Transit's proposal rank first in the technical evaluation, it also submitted the lowest price proposal, with savings of almost $1.94 million over RCL's second-place proposal.

Although RCL cites evidence that it asserts demonstrates bias, many of RCL's arguments are without legal support or rest on mere assertions of error. In focusing on the district court's alleged misapplication of the summary-judgment standard, RCL has failed to point to any material issues of fact, or explain how the standard applied by the district court prejudiced RCL. Because the record shows that, as a matter of law, the city did not demonstrate pervasive bias in its administration of the RFP, evaluation of proposals, or award of the contract, the district court did not err

in awarding summary judgment to the city and First Transit on RCL's bid-protest claim.

### III.

RCL alleges that the city deprived it of its rights to procedural and substantive due process because it had a "protectable property interest in being awarded the contract if it was the 'best value.'" The Minnesota Constitution provides that "[n]o person shall ... be deprived of life, liberty or property without due process of law." Minn. Const. art. I, § 7. And the United States Constitution provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. A plaintiff asserting either a procedural- or substantive-due-process claim must establish the existence of a protected liberty or property interest. *State v. Grigsby*, 818 N.W.2d 511, 517 (Minn.2012) (procedural); *In re Individual 35W Bridge Litigation*, 806 N.W.2d 820, 829 (Minn.2011) (substantive).

RCL requests that this court recognize a property interest in being awarded a contract if a bidder has the "best value." We decline to do so. The Minnesota Supreme Court has "limited the property rights that are entitled to due process to real property rights, final judgments, and certain vested statutory rights." *Schatz v. Interfaith Care Ctr.*, 811 N.W.2d 643, 658 (Minn.2012). "Vested property rights are those that have become so fixed that it would be inequitable to abrogate [the right] by retrospective legislation." *Id.* (quotations omitted). "[U]nder [state] law governing competitive bidding on public contracts, the lowest responsible bidder in compliance with the bidding specifications and procedures has a legitimate expectation in being awarded the contract once the governmental body

makes a decision to award the contract." *Schwandt*, 423 N.W.2d at 66 (quoting *L & H Sanitation, Inc. v. Lake City Sanitation, Inc.*, 769 F.2d 517, 523 (8th Cir. 1985)). But this rule is inapposite for two reasons.

First, unlike the lowest-responsible-bidder contract at issue in *Schwandt*, this contract involves a "best value" determination. As discussed above, we conclude that the city had discretion to determine which bid represented the best value for the city, and that the city did not abuse its discretion in awarding the contract to First Transit. Second, even in a lowest-responsible-bidder process, the lowest responsible bidder only gains a property right in being awarded the contract "once the governmental body makes a decision to award the contract." *Id.* (quotation omitted). In *Electrs. Unlimited Inc. v. Vill. of Burnsville*, the supreme court explained that "[w]here a contract is required to be let to the 'lowest responsible bidder' a bidder cannot compel the awarding of the contract to himself merely because his bid is the lowest, as such a provision is enacted for the benefit of the public and not the bidder." 289 Minn. 118, 123, 182 N.W.2d 679, 683 (1971) (quotation omitted).

Further, the city expressly reserved the right to "[w]ithdraw[ ], reissue[ ], or modify[ ] the RFP." "[A]n express reservation in the specifications … is sufficient authorization for the State's rejection of all bids even after the commencement of litigation and issuance of an injunction against the initial award of the contract." *J.L. Manta, Inc. v. Braun*, 393 N.W.2d 490, 494 (Minn.1986).

RCL attempts to compare its proposed interest to that of a "land use permit or license applicant who fulfills all requirements." But a contract is different from a permit or license where the right to the permit or license is conditioned solely on compliance with applicable ordinances. *See Northpointe Plaza v. City of Rochester*, 465 N.W.2d 686, 689 (Minn.1991) ("Minnesota recognizes a constitutionally protected property interest in an application for a land use permit which, as here, is conditioned only upon compliance with the zoning ordinance.").

■ A plaintiff's property right in a permit or license turns on the amount of discretion granted to the issuing authority under the relevant statutes. *Bituminous Materials, Inc. v. Rice Cnty., Minn.*, 126 F.3d 1068, 1070 (8th Cir.1997) ("A claim to entitlement arises, for these purposes, when a statute or regulation places substantial limits on the government's exercise of its licensing discretion."); *see also Northpointe Plaza*, 465 N.W.2d at 689 ("[T]his court has specifically looked to the Eighth Circuit for guidance on the issue of whether a zoning action rises to the level of a violation of a substantive due process right."). Where, as here, the issuing authority retains discretion both in determining best value and in whether to award the contract at all, a bidder does not gain a property right in being awarded that contract simply because it complies with all requirements of the RFP.

## IV.

RCL alleges that the district court "erred as a matter of law in granting summary judgment against RCL's and Holter's defamation claim in the face of genuine issues of material fact on whether [common-council member Michael] Wojcik defamed them." "To establish a defamation claim, a plaintiff must prove three elements: (1) the defamatory statement is communicated to someone other than the plaintiff, (2) the statement is false, and (3) the statement tend[s] to harm the plaintiff's reputation and to lower [the plaintiff] in the estimation of the community."

*Bahr v. Boise Cascade Corp.,* 766 N.W.2d 910, 919–20 (Minn.2009) (quotation omitted).

"[O]nly statements regarding matters of public concern which are not sufficiently factual to be capable of being proven true or false, and statements which cannot be reasonably interpreted as stating actual facts, are absolutely protected by the First Amendment." *Hunt v. Univ. of Minn.,* 465 N.W.2d 88, 94 (Minn.App. 1991). "Whether a statement can be proven false or interpreted as stating facts is a question of law." *McGrath v. TCF Bank Sav., FSB,* 502 N.W.2d 801, 808 (Minn. App.1993), *aff'd as modified,* 509 N.W.2d 365 (Minn.1993).

False statements accusing one of criminal activity or about one's business, trade, or professional conduct are defamatory per se. *Becker v. Alloy Hardfacing & Eng'g Co.,* 401 N.W.2d 655, 661 (Minn. 1987). "[T]he test is not whether the speaker intended to make an accusation, but whether a reasonable person under similar circumstances would understand the statement as making an accusation or imputing criminal ... misconduct to another." *Longbehn v. Schoenrock,* 727 N.W.2d 153, 159 (Minn.App.2007). But "[t]he defamatory character of any particular statement must be construed in the context of the article as a whole." *Jadwin v. Minneapolis Star & Tribune Co.,* 390 N.W.2d 437, 443 (Minn.App.1986).

Between December 2011 and February 2012, Wojcik made a series of statements on his website, votewojcik.org, and via his @VoteWojcik Twitter account. Wojcik does not deny that he made these statements and that he published them online. He has not asserted any form of privilege or immunity, as the statements were not made in the course of his official business—he described his website as a "hobby." And he does not dispute the district

court's conclusion that the statements meet the communication prong.

RCL asserts that the bolded statements below are false and defamatory because they "pertain[ ] to its business and profession, and accuse[ ] Rochester City Lines of illegal conduct and unethical behavior, including robbery and extortion." In a December 22, 2011 video posted on votewojcik.org and titled "How **RCL Stole $140,000 from taxpayers,**" Wojcik made the following statement:

So basically what [Holter] did is, because we essentially didn't have anyone else to go to and he knew he was the only person negotiating for this contract, he basically said, oh yeah, in addition to all that other stuff you're paying for us, we want a 3% across-the-board increase and $180,000 profit.... 

The $180,000 was negotiated down to $140,000, so that's $140,000 of additional taxpayer dollars that will be taken from taxpayers and given to Dan Holter for the sake of being—doing what he has always done.... 

Universally at the meeting there was a lot of contempt and disgust with Rochester City Lines for basically holding us hostage and ... making us feel like the buses weren't going to run at the start of the year if this contract wasn't done and if we did not go along with the ransom demands.

The Council did vote 4–2 to approve this contract. Myself and Bilderback strongly opposed.... Mr. Holter claims he has never made a profit on this, and Mr. Bilderback correctly brought up I think that he lives in a pretty doggone nice house to have never made a profit on this stuff. So I think that that's the real issue here.... This is just about greed, this is about **essentially extortion.** The extortion was a word that

was thrown out to me before this meeting and I used it a few times in this meeting and I think that we got in a situation where we didn't have anyone else to turn to, he knew he had us and he took advantage of us, and four council members did go along with that.

....

... I think this experience if nothing else has motivated the city to go out and find as many possible bidders as possible because we want to **make sure that we have a more ethical company to stand behind us and operate our transit system** then perhaps we feel we've gotten with Rochester City Lines over the last few months.

(Emphasis added.) Also on December 22, Wojcik posted a series of messages on his Twitter account:

> **At city council bus extortion approval meeting.... So ends one of the sleaziest public meetings I have ever been involved in. Public held hostage and robbed by #RCL....** Just total disgust at Rochester City Lines. [Link to video blog excerpted above.] ... Irked Rochester council approve[d] city bus agreement....

(Emphasis added.)

On February 16, 2012, Wojcik posted a blog entry on votewojcik.org titled "Rochester City Lines sues Rochester because they own the transit system." The relevant portion reads:

> ... I met with two of Dan's **senior staffers a few weeks back (shortly after Dan held the public hostage for a $110,000 [7] shakedown)....** A constitu-

ent joked to me that Dan's fighting to maintain his government sanctioned competition free contract would make him a great leader of the old Soviet Communist Party.

Dan also claimed th[at] RCL hadn't made any money on city bus service for 44 years. Which begs the question, is Dan lying? Why would he want to continue to not make money? **I believe that Dan is in fact lying.** I believe he finds profit in the generous salary he pays himself, the generous rent he gets [from] the city for his ancient garages, and the shared overhead he applies to the city programming.

(Emphasis added.)

RCL argues that the district court "(1) erred in applying the law and by failing to resolve all doubts and factual inferences against Wojcik ... and (2) erred legally on whether Wojcik's statements could be reasonably understood as statements of fact."

 As a threshold matter, RCL repeatedly asserts that the district court erred by failing to resolve all factual inferences and doubts against Wojcik. This assertion is not persuasive. The rule requiring the district court to interpret all factual inferences against Wojcik does not require the district court—or this court— to accept RCL's legal theories. It is the role of the courts to determine if, in context, a statement is reasonably capable of being proved true or false. *See McGrath,* 502 N.W.2d at 808. Determining that no reasonable person would interpret a statement in a particular way is a conclusion of law, not a finding of fact. *Id.*[8]

---

7. It appears that this should read $140,000, as the payment discussed here has been treated by the parties and the district court to be the same as the payment that was the subject of the December 22 communications.

8. Under Minn. R. Civ.App. P. 128.05, RCL cites to *Holler v. Hennepin Cnty.*, A13–1014, 2014 WL 349738 (Minn.App. Feb. 3, 2014). Unpublished cases of this court are not precedential and therefore do not constitute "pertinent and significant authority." Minn.Stat. § 480A.08, subd. 3(c) (2012).

## A. *"Hostage," "ransom," "extortion," "robbery" and "stole"*

RCL argues that the district court erred in granting summary judgment in favor of Wojcik because "[t]he factual criminal accusations are verifiable." We disagree. Read in context, Wojcik's statements are opinion and hyperbole, and not statements of fact capable of being proven true or false.

Wojcik was an elected member of the City of Rochester Common Council who served on that body leading up to and during the public-transit-contract bidding process. He maintains an online presence for "personal communication with voters." His statements were made on his personal website and on a social media website. Therefore, the context of his statements was inherently informal. *See Marchant Inv. & Mgmt. Co. v. St. Anthony W. Neighborhood Org., Inc.*, 694 N.W.2d 92, 97 (Minn.App.2005) (statements in a letter are more "personal and informal" than in a more formal document).

A statement is defamatory if a "reasonable person under similar circumstances would understand the statement as making an accusation or imputing criminal ... misconduct to another." *Longbehn*, 727 N.W.2d at 159. But although the words used by Wojcik can be used to describe criminal activity, in context, they can only reasonably be understood as protected rhetorical speech.[9] *See Marchant Inv.*, 694 N.W.2d at 96 ("Speech that is properly categorized as parody, loosely figurative, or rhetorical is also constitutionally protected to ensure that public debate will not suffer for lack of imaginative expression and because this type of speech cannot be reasonably interpreted as stating actual facts.").

RCL compares this case to *Longbehn*, in which this court reversed the district court's determination that the defendant was not liable for defamation for calling the plaintiff "Pat the Pedophile." 727 N.W.2d at 159. We concluded that "in almost every circumstance a reasonable listener would believe that calling a person a pedophile imputes serious sexual misconduct or criminal activity to that person." *Id.*

Unlike the word "pedophile," however, the words used by Wojcik are commonly used rhetorically to describe behavior the speaker might consider distasteful or morally suspect, but not criminal. In addition to the definition involving criminal activity, a hostage can also be "[o]ne that is manipulated by the demands of another." *The American Heritage Dictionary* 850 (5th ed.2011). "Extort" and "extortion" similarly have one definition referencing a criminal act, and a second meaning "[t]o obtain by coercion, intimidation, or psychological pressure." *Id.* at 628. And "to rob" can mean "[t]o deprive of something injuriously," while "to steal" can mean "[t]o get or take secretly or artfully." *Id.* at 1516, 1708.

Read in context, no reasonable person would believe that Wojcik's statements imply that RCL or Holter committed the criminal acts of hostage-taking, seeking ransom, extortion, theft, or robbery. As the United States Supreme Court concluded in *Greenbelt Co-op. Pub. Ass'n v. Bresler*, "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole." 398 U.S. 6, 14, 90 S.Ct. 1537, 1542, 26 L.Ed.2d 6 (1970) (concluding that use of the word "blackmail" in reference to a real estate developer's negotiating position by community members at a city council meeting and

---

9. Whether they constitute poor taste or judgment is an entirely different matter.

reprinted in a newspaper was neither slander nor libel).

RCL argues that *Greenbelt* does not apply because the defamation charge in that case was against a newspaper based on its report of statements made at the city council meeting. But RCL reads *Greenbelt* too narrowly—although the Supreme Court discussed the accuracy of the news reports, it also conclusively stated that "[i]t is simply impossible to believe that a reader who reached the word 'blackmail' in either article would not have understood exactly what was meant: it was Bresler's public and wholly legal negotiating proposals that were being criticized." *Greenbelt Co-op. Pub. Ass'n,* 398 U.S. at 14, 90 S.Ct. at 1542.

**B. "[A] more ethical company "**

 We also conclude that the district court did not err regarding Wojcik's statement that the city will "make sure that we have a more ethical company to stand behind us and operate our transit system." The word "ethical" is the sort of inherently subjective term Minnesota courts have held is incapable of being proven false. *See Hunt,* 465 N.W.2d at 94 (comments describing an individual's "warmth," "sincerity," and "integrity" could not be proven false); *McGrath,* 502 N.W.2d at 808 ("troublemaker" is not actionable because it "lacks precision and specificity" and "fails to suggest verifiable facts"); *Lee v. Metro. Airport Comm'n,* 428 N.W.2d 815, 821 (Minn.App.1988) ("As a matter of law, statements that appellant is a 'fluffy,' a 'b-tch,' or flirtatious are too imprecise in nature to be actionable defamatory statements.").

RCL concedes that "a more vague statement, such as that RCL had 'terrible ethics' would not be precise enough to be actionable," but argues that because "the statement against RCL was a comparative statement [it] is therefore distinguishable ... because it is more specific." This argument is not convincing. An inherently subjective word does not become a statement of fact because the speaker uses the word to differentiate between two options. Stating that a company is "more ethical" than another implies a subjective value judgment rather than suggesting verifiable facts, and, in this context, is not defamatory. *See McGrath,* 502 N.W.2d at 808.

**C. "I believe that Dan is in fact lying."**

 Finally, we conclude that the district court did not err in granting summary judgment on this statement as well. Read in context, it is clear that Wojcik is presenting his interpretation of Holter's statement:

> Dan also claimed th[at] RCL hadn't made any money on city bus service for 44 years. Which begs the question, is Dan lying? Why would he want to continue to not make money? I believe that Dan is in fact lying. I believe he finds profit in the generous salary he pays himself, the generous rent he gets [from] the city for his ancient garages, and the shared overhead he applies to the city programming.

It is true that Wojcik's seat on the common council and his involvement in the contract negotiations could theoretically put him in possession of additional information. But Wojcik immediately outlines the facts underlying his statement that he "believe[s] Dan is in fact lying," because he considers "profit" to include Holter's salary, his rental arrangement with the city, and the overhead received by RCL. In context, his statement could not reasonably be understood to imply the assertion of undisclosed facts. *See Lund v. Chicago & Nw. Transp. Co.,* 467 N.W.2d 366, 369 (Minn.App.1991) ("[T]he court determines whether an expression of opinion may rea-

sonably be understood to imply the assertion of undisclosed facts." (citing Restatement (Second) of Torts § 566 comm. c (1977))), *review denied* (Minn. June 19, 1991).

Because we conclude that Wojcik's statements were not actionable defamation, RCL and Holter's claims fail as a matter of law, and the district court did not err in granting summary judgment in favor of Wojcik.

### DECISION

Because RCL's claims fail as a matter of law, the district court did not err in granting summary judgment on all claims in favor of respondents.

**Affirmed.**